Delores SIMMONS, Administratrix of
the Estate of Daniel La Friscoe
Simmons, Deceased

v.

The CITY OF PHILADELPHIA and
Officer Albert Panati.

Civ. A. No. 87–3258.

United States District Court,
E.D. Pennsylvania.

Jan. 10, 1990.

Mark Frost, Philadelphia, Pa., for plaintiff.

Miriam B. Brenaman, Chief Asst. City Sol., Law Dept., Philadelphia, Pa., for defendants.

## OPINION AND ORDER

VAN ANTWERPEN, District Judge.

From July 10 to July 13, 1989, a jury trial was held before this court in the above-captioned matter. On July 13, 1989, the jury returned a verdict finding the defendant, the City of Philadelphia ("City"), liable to the plaintiff for violations of plaintiff's decedent's constitutional rights, pursuant to 42 U.S.C. § 1983, and also finding the City negligent. The jury also found police officer Albert Panati ("Panati") negligent, but not liable under the plaintiff's 42 U.S.C. § 1983 constitutional claims. The defendants have now moved for post-trial relief in the form of judgment notwithstanding the verdict and for a new trial. For the reasons given below, we find that the defendants' request for such relief must be denied.

Before discussing the law, we believe it is first necessary to set forth the basic facts in the instant case. On October 19, 1985, Daniel Simmons ("Simmons") was taken into custody near City Hall for public intoxication by the City police department. Simmons had had no prior convictions and was 24 years old. Although technically an arrest, the policy of the City set forth in Directive # 128 is usually to release persons picked up for public intoxication to responsible parties or release them after they have sobered up without filing any formal criminal charges. At the time he was taken into protective custody, the decedent was crying, anxious and very intoxicated. The police officers tried to calm him down and transported him to the City's Sixth Police District. Upon arrival, Simmons was placed in the custody of Officer Panati, the Sixth District turnkey. Panati was told that Simmons had been upset and crying upon being taken into custody.

Once in the Sixth District, Simmons again became very emotional and confused. He expressed deep concern about his arrest and its consequences. In spite of his condition, the minor nature of his offense, and his inability to call his family, no one placed a call for him. After processing Simmons, Panati removed Simmons' belt and personal belongings and locked him in Cell No. 6 at approximately 5:00 a.m. No one else was in the cell block during the time Simmons was in custody. Although there were other jails in the City which were not totally empty, Simmons was not taken to one of them. Panati did not initially remove Simmons' shoe laces. According to Officer Panati, he removed Simmons' shoe laces approximately fifteen minutes after he was placed in the cell, because Simmons had untied them and they were flopping around. Aside from removing the shoe laces, no other steps were taken to protect Simmons.

Officer Panati's desk was in an adjacent area separated by a wall and a steel door. Panati was unable to see the cell block area from his work place and unable to see Simmons unless he physically entered the block and inspected his cell.

Panati maintained a log of the times he checked on prisoners. Such checks are to be made every fifteen minutes. Panati testified that, regardless of when he actually inspected the prison cells, he nevertheless wrote down that he inspected the cells at exactly every quarter hour. Panati also testified that his duties would sometimes take him away from the cell area and, at times, even outside the Sixth District building itself.

Panati further testified that during at least one hour of Simmons' incarceration, the decedent was very upset and periodically rattled the bars of his cell. Simmons remained unresponsive to any words spoken by Panati. Panati described Simmons' condition as being in a "stupor" with "glassy eyes". The entire time Simmons was in the cell, he remained standing at the cell door. His reactions ranged from confusion to hysteria.

Officer Panati found Simmons hanging from his cell at 6:38 a.m. Upon discovering

Simmons' body, Panati cut him down and called for medical rescue. He, himself, however, did not attempt any type of medical resuscitation on Simmons. The police rescue did not arrive until 6:55 a.m., a full seventeen minutes after discovery of the body. At death, Simmons' blood alcohol content level was .24. Far from being "protective"—Simmons' custody was fatal. Simmons' mother has brought this suit against the City and Officer Panati for the death of her son.

In ruling on a motion for judgment notwithstanding the verdict, the trial court is obliged to consider the evidence in a light most favorable to the party prevailing with the jury. Accordingly, it must be assumed by the trial court that all conflicts in the evidence were resolved by the jury in favor of plaintiff's evidence. The plaintiff is also to be given the benefit of all favorable inferences which may be reasonably drawn from the facts proved. Moreover, the defendants' motion must be denied if, upon reviewing the evidence in the above described light, reasonable men could differ as to the conclusions to be drawn from the evidence. *J.J. Farms, Inc. v. Cargill, Inc.,* 693 F.2d 830 (8th Cir.1982); *Mroz v. Dravo Corp.,* 293 F.Supp. 499 (W.D.Pa.1968), *aff'd,* 429 F.2d 1156 (3d Cir.1970).

■ A court cannot grant a judgment n.o.v. based on a ground not raised in a party's motion for directed verdict.

[A] motion for judgment n.o.v. based on a ground not raised in a party's Motion for Directed Verdict, cannot be granted.... The Third Circuit has interpreted strictly the requirements of F.R.Civ.P. 50(b) that a motion for directed verdict after the presentation of all evidence is a prerequisite to a motion for judgment n.o.v. .... Indeed, to entertain the plaintiff's motion, might deprive defendant of its Seventh Amendment rights to a trial by jury....

*Sharpe v. Coopers & Lybrand,* 457 F.Supp. 879, 885 (E.D.Pa.1978) (citations omitted), *aff'd,* 649 F.2d 175 (3d Cir.1979), *cert. denied,* 455 U.S. 938, 102 S.Ct. 1427, 71 L.Ed.2d 648 (1982). Furthermore as a general rule, although exceptions are now unnecessary, to properly preserve an issue a party must either object or otherwise inform the court of the action which a party desires. Fed.R.C.P. 46. *Bucy v. Nevada Construction Co.,* 125 F.2d 213 (9th Cir.1942). Similar more specific rules apply to the court's rulings on evidence, Fed. R.Evid. 103, and instructions to the jury, Fed.R.Civ.P. 51.

Most of the arguments raised in the defendants' motions for judgment n.o.v. and new trial were not raised in defendants' motion for directed verdict, or for that matter, raised at any point during the course of the trial. Defendants moved for a directed verdict "for the reasons stated in defendants' Trial Brief." Therefore, any arguments raised by defendants in the instant motions and not appearing in the trial brief are waived. We can find only two arguments raised in the defendants' motion for post-trial relief that were raised in the motion for directed verdict. These are: that the plaintiff's claim for violation of 42 U.S.C. § 1983 must fail because of lack of evidence regarding the City's conduct and the "deliberate indifference" standard mandated by *City of Canton v. Harris,* —— U.S. ——, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), and that the defendants owed no duty to Simmons, since no "special relationship" existed between the decedent and the police. We must treat all other motions as waived. Nonetheless, we will proceed to address not only these arguments, but also all of the others, and to explain why even if they had been properly raised they would not have succeeded.

Basically, the defendants' arguments in favor of their motions appear to consist of the following premises: (1) that the evidence presented in the instant case did not reach the "deliberate indifference" standard mandated by *City of Canton,* 109 S.Ct. 1197; (2) that the jury reached an inconsistent verdict in its response to Question One on the verdict sheet; (3) that the jury did not find a causal relationship between the decedent's death and the conduct of the City and the conduct of Officer Panati; (4) that no pendent state law negligence claims were alleged or proved upon

which an award could rest; (5) that the City is immune from suit for negligence; and (6) that it was error to permit a photograph of the plaintiff's decedent to go to the jury.

I. The Evidence and the "Deliberate Indifference" Standard

■ The defendants argue that the plaintiff failed to establish that the City was deliberately indifferent to the serious medical needs of Daniel Simmons, the plaintiff's decedent. The defendants do recognize that the instant case comes within the ambit of *City of Canton*, 109 S.Ct. 1197 and, generally, *Monell v. New York City Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). In *City of Canton*, the United States Supreme Court accepted "deliberate indifference" as the standard in cases under 42 U.S.C. § 1983 alleging inadequate training of municipal personnel. In the *City of Canton* decision, the Court considered inadequate training in the context of municipal policy:

> *Monell*'s rule that a city is not liable under § 1983 unless a municipal policy causes a constitutional deprivation will not be satisfied by merely alleging that the existing training program for a class of employees, such as police officers, represents a policy for which the city is responsible. That much may be true. The issue in a case like this one, however, is whether that training program is adequate; and if it is not, the question becomes whether such inadequate training can justifiably be said to represent "city policy". It may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees. But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

*Id.* 109 S.Ct. at 1205 (footnotes omitted).

In the instant case, the plaintiff presented sufficient evidence with respect to lack of proper training *vis-a-vis* intoxicated detainees to support a verdict of deliberate indifference.

Plaintiff's experts, Joseph Rowen and Dr. Edward Guy both testified that Simmons fit the psychological profile of an individual who was at high risk to commit suicide, *i.e.*, he was intoxicated, young, a high school graduate, employed, agitated, crying, unresponsive, and exhibiting mood swings. Dr. Guy further testified that 99 per cent of all suicides take place in isolated cells and that the periodic checks, as allegedly made by Officer Panati, are nowhere near sufficient.

Joseph Rowan, an expert on corrections, testified for the plaintiff that standards established by the Commission on Accreditation of Law Enforcement Agencies (CALEA) and the American Correctional Association, which were available and known to the City prior to the instant incident, recognize that intoxicated detainees are high risk suicide candidates and should be under observation at all times. Moreover, published standards detailing procedures for identifying suicidal detainees and preventing suicides were also available and known to the City prior to this incident. In addition, Mr. Rowan cited a number of cities and states which had instituted successful suicide prevention plans prior to the death of Daniel Simmons.

Both experts testified that intoxicated detainees, especially those exhibiting the symptoms of Simmons, should be observed at all times. Mr. Rowan based his testimony on CALEA standard 72.5.4 which requires intoxicated arrestees to be under observation at all times. Both experts further testified that even a layman with minimal training could observe intoxicated arrestees and recognize suicidal symptoms.

Both experts further testified that constant observations and medical care could be accomplished in a number of ways. They noted that television monitoring, physical restraints, multiple celling, use of other personnel (such as other inmates or volunteers or police aids), use of other city agencies could all be implemented. Architectural changes could also be made at low cost that would allow staff personnel to be present within the cell area or a special plexiglass "suicide prevention cell" could be installed.

The City's own police officers admitted that they had no training in suicide prevention. Officer Panati said specifically that he had no such training. Sergeant Heran of the City police department's research and development department could not say for sure whether police officers receive any police academy training regarding suicide.

Further testimony regarding the City's actual knowledge of suicidal tendencies was heard from Simmons' stepbrother, Reginald Rosemond. Mr. Rosemond testified that shortly after the suicide a Police Officer named LaGara stated to him that Simmons had been acting peculiarly while in detention and, therefore, they took his shoe laces from him. The officer also stated to him that people who are intoxicated are at a higher risk to commit suicide.

In addition to the above testimony on training and standards, various statistics were introduced by the plaintiff which were compiled by the City through the office of Sergeant Heran. These statistics showed that twenty people had committed suicide in City lock-ups between 1981 through 1985. Simmons was number twenty. Of those twenty, fifteen persons were intoxicated. Moreover, the plaintiff introduced further testimony showing the number of attempted suicides in City lock-ups.

Dr. Guy, who is a forensic psychiatrist and head of psychiatry at the City prison system, further testified that the City was aware in 1981, and prior thereto, of a correlation of people who were intoxicated and committing suicide and that the City had requested him to participate in a training program and to make recommendations.

Dr. Guy, who had made a study of Philadelphia prison detainees, stated that persons who are most likely to commit suicide were intoxicated or on drugs, somewhat better educated, employed, and showed signs of emotional disturbance and agitation. He noted that intoxication is a "red flag warning" of a potential suicide. Dr. Guy also testified that he told the City in 1981 that changes in procedures would save lives. He stated that persons meeting the above-stated criteria must be placed in constant observation, or monitored, or physically restrained when neither of the other two alternatives are available. He further recommended that some simple architectural changes be made so the staff would be present within the cell area so that no detainee could be left in isolation. He also informed the City that all officers should be trained in suicide prevention and detection. All of this information was communicated to the City police department in 1981, four years before Simmons' death. Finally, Dr. Guy testified that due to the mental state of the decedent, he had a diminished mental capacity and was at high risk to commit suicide. Both experts testified that if Simmons had been constantly observed by various means, his suicide would have been prevented.

Both experts testified that the conduct and actions of the City and of Officer Panati were negligent and constituted deliberate indifference. Dr. Guy based his opinion on his knowledge as a forensic psychiatrist treating inmates and on studies he had conducted. Mr. Rowan based his opinion on his expertise in corrections and on studies with respect to jailhouse suicides. Both experts testified that Daniel Simmons was at high risk to commit suicide and that his suicide was foreseeable and preventable.

The jury had before it all of the evidence discussed above. We believe that it could well have found that the City-defendant had transgressed the "deliberate indifference" standard when it came to meeting the serious medical need of the plaintiff's obviously intoxicated decedent. Accordingly, we find no merit in this argument ad-

vanced by the defendants in support of their motion.

## II. Alleged Inconsistency on the Verdict Sheet

▇▇▇ Question One on the verdict sheet in the instant case reads as follows:

INDICATE WHETHER OR NOT YOU FIND THAT UNDER SECTION 1983 OF TITLE 42 U.S. CODE THE DEFENDANT OFFICER [PANATI] ACTED UNDER COLOR OF THE AUTHORITY OF PENNSYLVANIA TO DEPRIVE THE DECEDENT OF HIS CONSTITUTIONAL RIGHTS.

The jury responded "No" to this question, but went on to find Panati negligent. The defendants argue that, by answering "No", the jury failed to find either of the essential elements required to maintain an action under 42 U.S.C. § 1983, *i.e.*, conduct by a person acting under color of state law and conduct which deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States. We do not believe that the jury's verdict was "inconsistent". At trial, there were two defendants and two separate theories of liability presented. All that this "No" answer on the part of the jury means is that the jury did not find *Officer Panati* liable under the constitutional theory advanced pursuant to 42 U.S.C. § 1983.

We believe that this verdict is completely consistent with the facts presented at trial. The jury could conclude that Officer Panati's own actions were negligent, without rising to a constitutional standard of deliberate indifference. There were sufficient facts to support the jury's verdict of negligence: *i.e.*, Officer Panati's inexact recordkeeping showed that he did not properly inspect or care for the decedent; he failed to recognize Daniel Simmons' physical and emotional state and exercise ordinary care; he failed immediately to remove flopping shoelaces or recognize what they portended; he rendered no assistance to the decedent despite his stupor, his rattling of the bars, and his unresponsiveness. He failed to provide any medical attention or telephone relatives concerning decedent's con-

dition. Officer Panati admitted at trial that he had no training regarding detection and prevention of suicides. Thus, it was up to the jury to decide whether the officer's conduct amounted to negligence and/or rose to a level of deliberate indifference. Here, the jury concluded that Panati himself was negligent.

The jury could also separately conclude that the City was deliberately indifferent, based on the facts previously discussed. It is well settled that local governing bodies may be sued directly under § 1983 for monetary relief. *Monell*, 436 U.S. at 690, 98 S.Ct. at 2035. The Supreme Court has stated:

[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

*Id.* at 694, 98 S.Ct. at 2037.

In the instant case, the official policies, custom and actual procedures used by the City, its police officers generally, and those who had contact with Daniel Simmons particularly, led directly to Simmons' death. When the jury found a § 1983 violation on the part of the City, it did so because of the City's own conduct, not because of any kind of *respondeat superior* liability— which liability is specifically forbidden under *Monell*, 436 U.S. at 691, 98 S.Ct. at 2036.

Rather than being inconsistent, the jury's verdict demonstrates a full understanding of the facts and the law. Rather than finding all defendants liable on all counts, the jury recognized that Panati's behavior was negligent without rising to a level of deliberate indifference. We find no "inconsistency" at all.

The defendants also argue that this "No" response of the jury to Question One means that the jurors were really finding that the officer was not acting under color of state law and, thus, that no § 1983 liability can attach to the City. At trial, however, there was no issue regarding whether the police officer involved in this incident

acted under color of state law. During the jury instruction conference, defendants' counsel agreed that Officer Panati was acting under color of state law and, furthermore, this court charged the jury and explained the meaning of acting "under color of state law." Moreover, there was not any objection to the charge and verdict slip with respect to any instructions and questions relating to this principle. We, therefore, find this contention of the defendants to be without merit.[1]

## III. Alleged Lack of Causal Relationship

The defendants further contend that the jury failed to find a causal relationship which links the conduct of the City and Officer Panati with the death of Daniel Simmons. Not only did this court charge the jury on proximate cause and substantial legal cause but also, Jury Question Five specifically asked the jury to answer this very question:

5. INDICATE FOR THE DEFENDANT OFFICER YOU HAVE ANSWERED "YES" IN QUESTION 1 OR QUESTION 2, OR THE CITY IF YOU HAVE ANSWERED "YES" IN QUESTION 3 OR QUESTION 4, WHETHER OR NOT SUCH DEFENDANTS' ACTIONS WERE A LEGAL CAUSE OF ANY HARM TO THE DECEDENT.

This question was answered in the affirmative for the City and the officer and, thus, the proper causal link was indeed found by the jury in the instant case.

## IV. Pendent State Law Negligence Claims

■ The defendants also argue that the plaintiff failed to allege and to prove state law negligence claims. We must reject this contention for several reasons. First, the complaint clearly alleges negligence at

paragraphs 15, 25 and 26. Second, at no time did the defendants object to the plaintiff's pendent state claims. During the pre-trial conference, defense counsel stated that he had no objections to the state claims, as long as he could have a jury instruction with respect to wanton and intentional conduct with respect to the suicide. It was further agreed by counsel that there would be no comparative negligence charge thereby avoiding an overly complex verdict sheet. Thus, in addition to not objecting to the negligence claims, defendants actively acknowledged them.

Also, during the trial, the court directed counsel to prepare points for charge based on the federal claims and state claims. Once again, the court had mentioned that it would be charging on negligence and again defendants' counsel did not object. Additionally, defendants did not object to any jury instruction proposed by plaintiff with respect to negligence at the charging conference or during the charge to the jury. Thus, defendants have waived any objection they might have had to plaintiff's negligence claims.

■ Defendants further argue that as a matter of law no claim for negligence could be made out by plaintiff. Police officers who take an intoxicated person into protective custody, and thereby deprive that person of his normal opportunities for protection are under a duty to take reasonable actions to protect such persons in custody from unreasonable risk of physical harm. *See Restatement of Torts 2d* § 314A (1965).

It is clear from the evidence that the jury found that defendants did not exercise reasonable care to protect the plaintiff's decedent from an unreasonable risk of physical harm.[2]

---

1. Before leaving this discussion of Officer Panati's conduct, we wish to note that the defendants are laboring under a misapprehension as to the jury's characterization of such conduct. In Part II, 4 of the defendants' motion, the defendants refer to a finding by the jury that Officer Panati's conduct was "malicious, wanton, and oppressive." In fact, the jury, on the Verdict Sheet, specifically answered "No" to Question Six which reads: "INDICATE FOR THE DEFENDANT OFFICER IF YOU HAVE ANSWER-

ED 'YES' IN QUESTION 5(a) WHETHER OR NOT SUCH DEFENDANT'S ACTIONS WERE MALICIOUSLY, WANTONLY, OR OPPRESSIVELY DONE."

2. The defendants have referred, at several points in their brief, to certain police directives which existed regarding the treatment of arrestees and have presented various arguments, *i.e.*, that such directives do not constitute state law and that such directives are surely as "constitu-

Nor do we find merit in defendants' contention that *Melendez by Melendez v. City of Philadelphia*, 320 Pa.Super. 59, 466 A.2d 1060 (1981) and *DeShaney v. Winnebago County*, —— U.S. ——, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) preclude plaintiff's action, because defendants had no "special relationship" with Daniel Simmons which would create a duty to protect him. Both of these cases are distinguishable from the case at bar.

In *DeShaney*, the plaintiff was severely beaten and permanently injured by his father with whom he lived. The plaintiff instituted an action under § 1983 against the social workers and local officials who received complaints that the plaintiff's father was abusing him and had reason to believe that the complaints were accurate, but did not act on this information. The Supreme Court found that the state's children's service department owed no duty to protect an abused child from *private* violence.

Here, Daniel Simmons was not free to leave, nor was he in the private sector. He was, instead, under the care and custody of the City police department. *DeShaney* itself expressly recognizes both this distinction and the duty owed to detainees:

> [W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being. See *Youngberg v. Romeo, supra,* 457 U.S., [307] at 317, 102 S.Ct., [2452] at 2458 [73 L.Ed.2d 28] ("When a person is institutionalized—and wholly dependent on the State[,] ... a duty to provide certain services and care does exist"). The rationale for this principle

is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.,* food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause. See *Estelle v. Gamble,* 429 U.S., [97] at 103–104, 97 S.Ct., [285] at 290–291[, 50 L.Ed.2d 251]; *Youngberg v. Romeo, supra,* 457 U.S., at 315–316, 102 S.Ct., at 2457–2458. The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf. See *Estelle v. Gamble,* 429 U.S. at 103, 97 S.Ct. at 290 ("An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met").

*Id.* 109 S.Ct. at 1005–1006 (footnote omitted).[3]

Defendants also rely on *Melendez,* 466 A.2d 1060, to support their "no special relationship" argument. In *Melendez,* a child was the victim of a racial confrontation in a Philadelphia neighborhood. The child's parents brought suit against the City of Philadelphia on the theory that its police department and human relations commission, having been apprised of racial problems in the neighborhood, failed to provide plaintiff and their neighbors with police protection beyond that owed the public at large. In granting the motion for summary judgment in favor of defendants, the Superior Court held that a municipality has no general duty to provide police protection

---

tional" as those found in *City of Canton,* 109 S.Ct. 1197. We believe, however, that the issue in the instant case is not the quality of the existing directives, but the failure of the City to devise a policy specifically concerned with the situation which led to the death of the decedent here: the proper training for and treatment of intoxicated detainees. We, therefore, discount these arguments advanced by the defendants.

**3.** The omitted footnote is number 7, which reads: "Even in this situation [institutionaliza-

tion], we have recognized that the State 'has considerable discretion in determining the nature and scope of its responsibilities.' *Youngberg v. Romeo,* 457 U.S., at 317, 102 S.Ct., at 2458." Such discretion would not, of course, encompass neglect of the safety of intoxicated detainees. This is certainly true in the instant case, given the circumstances stated in this opinion which should have given the City notice of the peculiar vulnerability of such individuals to suicide.

to any particular person or group. *Id.* at 1063–1064.

Again, Simmons was not part of the general public, but was placed into custody for the purpose of providing him with protection from harm which he might cause to himself or to others as a result of his intoxicated condition. At the moment he was arrested and placed into custody, the defendants had a duty to provide for the care and safety of the decedent. "Because an inmate is not free to leave the confines which s/he is forced to share with other prisoners, the state bears the responsibility for the inmate's safety." *Colburn v. Upper Darby Township*, 838 F.2d 663, 668 (3d Cir.1988), *cert. denied* — U.S. ——, 109 S.Ct. 1338, 103 L.Ed.2d 808 (1989), *quoting Davidson v. O'Lone*, 752 F.2d 817, 821 (3d Cir.1984), *aff'd sub nom, Davidson v. Cannon*, 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986). A detainee is entitled, at a minimum, to no less protection than that afforded a convicted prisoner. *Colburn*, 838 F.2d at 668.

Since we find negligence properly alleged in the complaint and ample evidence presented at the trial to support such claims, we must discount this part of the defendants' argument in support of their motion.

## V. Governmental Immunity

In their motions following those for a new trial and judgment n.o.v., defendants have raised the issue of governmental immunity which we believe should be addressed at this point. Unlike most other municipalities in Pennsylvania, Philadelphia City Council has enacted an ordinance, now found in Chapter 21–700 of the Philadelphia Code, which waives governmental immunity. Code section 21–701 reads, in pertinent part, as follows:

> (a) The City shall not plead governmental immunity as a defense in any civil action commenced by any person sustaining bodily injury or death caused by negligence or unlawful conduct of any police officer while the latter is acting within the scope of his office or employment....

The City argues in its motion that the Philadelphia City Council's waiver of governmental immunity, as found in the city ordinance cited above, is invalid and the City is, thus, immune from suit. It bases this contention upon *In Re Upset Sale of Properties (Skibo)*, 560 A.2d 1388 (Pa.1989). Said the Pennsylvania Supreme Court in *Skibo:*

> The tax claim unit has raised their governmental immunity for the first time on appeal. They claim they are not only immune but that their immunity is not waivable, even if they negligently failed to do so before. Perhaps here is one reason their immunity cannot be waived; a governmental agency cannot be put at the mercy of negligent or agreed waiver by counsel of a substantive right designed to protect its very existence....

The instant defendant, the City, raises this defense, too, for the first time, post-trial. But, the immunity in the case at bar was not waived "by counsel"; it was waived, instead, by the legislative body of a municipality. We believe that this is an important distinction. The *Skibo* opinion also states:

> This Court in *Mayle v. Pennsylvania Department of Highways*, 479 Pa. 384, 388 A.2d 709 (1978) obviated sovereign immunity as a common law defense and the legislature promptly restored it. The legislature, in restoring it, granted some exceptions where the negligence is as common as it is injurious to its victims. That they relented at all, however, is of grace and not of right.... Defense of governmental immunity is an absolute defense, directly analogous to our holding in workmen's compensation cases and is not waivable, *LeFlar v. Gulf Creek Industrial Park*, 511 Pa. 574, 515 A.2d 875 (1986), nor is it subject to any procedural device that could render a governmental agency liable beyond the exceptions granted by the legislature. *Wilson v. Philadelphia Housing Authority*, 517 Pa. 318, 536 A.2d 337 (1988)
> . . .

*Id.* at 1389.

We also believe that this seemingly broad pronouncement of the Pennsylvania

Supreme Court is distinguishable, in the circumstances of the instant case.[4]

In *City of Philadelphia v. Middleton*, 89 Pa.Cmwlth. 362, 492 A.2d 763 (Pa.Commw. 1985), the Commonwealth Court addressed not the issue of a negligent waiver of immunity by counsel, but the issue specifically raised in the instant case: the Philadelphia City Council's intentional waiver of immunity by City Ordinance. When the highest court of the state has not authoritatively considered an issue, "our disposition of such cases must be governed by a prediction of how the state's highest court would decide were it confronted with the problem." *McKenna v. Ortho Pharmaceutical Corp.*, 622 F.2d 657, 661 (3d Cir. 1980), *cert. denied*, 449 U.S. 976, 101 S.Ct. 387, 66 L.Ed.2d 237 (1980). *See also Becker v. Interstate Properties*, 569 F.2d 1203, 1205 (3d Cir.1977), *cert. denied*, 436 U.S. 906, 98 S.Ct. 2237, 56 L.Ed.2d 404 (1978). In this effort, the Federal court must give "proper regard" to the relevant rulings of other courts within the state. *Commissioner v. Estate of Bosch*, 387 U.S. 456, 465, 87 S.Ct. 1776, 1783, 18 L.Ed.2d 886 (1965). *See also Erie Castings Co. v. Grinding Supply, Inc.*, 736 F.2d 99, 100 (3d Cir.1984).

With this approach in mind, we shall proceed to examine what the court said in *Middleton*. First, the court discussed the appellant's challenge to continued viability of this City Ordinance after the enactment of the Political Subdivision Tort Claims Act, 42 Pa. Cons.Stat.Ann. §§ 8541–8564 (Purdon 1982 & Supp.1989):

> When this ordinance was first enacted by the City Council of the City of Philadelphia in 1962, it waived immunity in all actions arising out of the negligent or unlawful conduct of any city employee. In 1971 the ordinance was amended to cover only actions of police officers. While appellant does not directly challenge the validity of the ordinance at the time it was enacted, it argues that its validity was completely lost in 1978 when

the [Political Subdivision Tort Claims] Act was passed. In support of this argument, appellant first relies on Section 802(c) of the Act which provides that "all other acts or part of acts are repealed to the extent of any inconsistency." Appellant submits, alternatively, that even if this Court holds that the ordinance was not expressly repealed by the Act, we must find that it has been repealed by implication because a municipal ordinance which is contradictory or inconsistent with a subsequent state statute is impliedly repealed by the enactment of the statute. *United Tavern Owners of Philadelphia v. Philadelphia School District*, 441 Pa. 274, 272 A.2d 868 (1971). Clearly, both of these arguments rest on the premise that the Act and the ordinance are contradictory or inconsistent. We disagree.

*Id.* 492 A.2d at 764.

The *Middleton* court then went on to admit that this was a question of first impression for Pennsylvania's appellate courts; it found guidance, however, in a decision of the Eastern District of Pennsylvania, *Borenstein v. City of Philadelphia*, 595 F.Supp. 853 (E.D.Pa.1984) (Pollak, J.). The *Middleton* court stated:

> The court in *Borenstein* held that the city's waiver of immunity is not at all inconsistent with the Act. The court reviewed the legislative history of the Act and noted that it was enacted in order to reinstate in part the immunity which had been abrogated by *Ayala v. Philadelphia Board of Public Education*, 453 Pa. 584, 305 A.2d 877 (1973). The legislature's main concern was to avoid the possible devastating effects which an unpredictable number of law suits would have on municipal budgets. There is no indication, however, that the eight exceptions listed in the Act were intended to be exclusive or that local municipalities were forbidden to waive the immunity granted by the Act. In fact, it is stated

---

**4.** With regard to the exceptions carved out by the Political Subdivision Tort Claims Act, the defendant cites to the "real estate exception" found at 42 Pa. Cons. Stat.Ann. § 8522(b)(3) (Purdon Supp.1989) and states that the case at bar would not fit under this category. We agree, but we do not find that this is, or ever was, an issue in the instant case.

in the Report of the Joint State Government Commission on Sovereign Immunity that "as ... experience with costs of claims and administrative expenses accumulates, limited waivers in other areas of possible liability may be added." May 1978 Report at 10. The Supreme Court in *Carroll v. County of York*, 496 Pa. 363, 369, 437 A.2d 394, 397 (1981), cited this report as the "basis for the Political Subdivision Tort Claims Act." We, therefore, conclude that the City of Philadelphia acted well within the powers derived from its Home Rule Charter in deciding that it would be in the best interest of its citizens to waive governmental immunity in cases where bodily injury or death has resulted from the negligent or unlawful conduct of its police officers.

*Id.* 492 A.2d at 764–765.[5]

We believe that *Skibo*, the Pennsylvania Supreme Court case cited by the City, does not address the precise issue under discussion. *Middleton*, although a Commonwealth Court decision, does so address that issue. Given the guidance provided by an intermediate state court decision directly on point with regard to the issue in the case at bar, we believe that *Skibo* is inapplicable. We choose, instead, to follow *Middleton*, and, accordingly, find the City's waiver of immunity under the City Ordinance in question to be proper.

## VI. Photograph of Plaintiff's Decedent

■ The defendants argue that it was error for the court to permit one post-suicide photograph of the plaintiff's decedent to go out with the jury. The plaintiff had called Halbert Fillinger, M.D., the Deputy Medical Examiner who autopsied the body of Daniel Simmons. Within Dr. Fillinger's testimony, a color photograph of plaintiff's decedent's clothed body was used to show the jury the strangulation marks and condition of decedent's body. There is no blood or any mutilation of the body depicted in the photograph. Simmons' face is shown from the side only and his eye is closed. The photograph was also used by Dr. Fillinger to illustrate the pain and suffering decedent endured. Defendants claim that the court's admission of this photograph is an error which requires the granting of a new trial.

The admission or rejection of a photograph lies largely in the sound discretion of the trial judge. *United States v. Stratton*, 392 F.Supp. 552, 554 (E.D.Pa.1975), *aff'd*, 523 F.2d 1052, *cert. denied*, 424 U.S. 945, 96 S.Ct. 1415, 47 L.Ed.2d 351 (1976).

Fed.R.Evid. 403 does provide that otherwise relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. It has, however, been recognized that Rule 403 should be very sparingly used. *Hendrix v. Raybestos–Manhattan, Inc.*, 776 F.2d 1492, 1502 (11th Cir.1985). Here, the court found that the photograph was not inflammatory but was relevant and probative. The jury was charged not to base their verdict on sympathy.

In the instant case, the court reviewed numerous photographs of decedent and allowed the plaintiff to use but one. The photograph admitted is relevant to both the issues of cause of death and pain and suffering. We see no error in the use of this photograph in the instant case.

For all of the reasons set forth in the above opinion, we find that the defendants are entitled neither to judgment n.o.v. nor to a new trial.[6] The City clearly owed

---

5. Judge Pollak has provided an excellent discussion of the city ordinance under discussion and its propriety under Philadelphia's Home Rule Charter, 53 Pa.Stat.Ann. §§ 16251–17096 (Purdon 1957 & Supp.1989), 53 P.S. § 13133 (Purdon 1957), which deals with limitations on the City's powers, and the Political Subdivision Tort Claims Act, 42 Pa. Cons. Stat.Ann. §§ 8541–8564 (Purdon 1982 & Supp.1989). *See Borenstein*, 595 F.Supp. at 858–859.

6. The defendants have brought to our attention a recent case from the Third Circuit, *Williams v. Borough of Westchester*, 891 F.2d 458 (3d Cir. (1989)). *Williams* concerned the affirmance of a district court's granting of summary judgment in favor of the defendants in a case involving a jailhouse suicide. We believe, however, that the instant case is distinguishable from *Williams*. First, the procedural posture of the cases is different. *Williams* was a case decided upon a motion for summary judgment; the instant case

something more to a young man whose only transgressions were having too much to drink and being in a public place.

was decided after the evidence was presented to a jury after a four-day trial. In *Williams*, a case where the decedent was a mentally-ill person with many suicide attempts in his past, there was no evidence that the officers involved knew of his former history of attempts at self-destruction. In the instant case, the City of Philadelphia knew or should have known that intoxicated detainees are at a higher risk of suicide and Officer Panati certainly knew that the plaintiff's decedent was drunk and upset regarding his incarceration. Furthermore, in *Williams*, the court, at several points, called its decision in favor of affirming the grant of summary judgment "close" and had stated that more thorough discovery might have effected a different result. At trial, the plaintiff produced evidence upon which the jury could properly find that the City of Philadelphia's policy, custom and treatment of intoxicated detainees amounted to deliberate indifference, and that Officer Panati's actions were negligent. For all of these reasons, both procedural and substantive, we believe that *Williams* is inapplicable to the case at bar.