896 F.Supp. 1401 (1995)
Steven A. LITZ, Esquire, Guardian for the Estate and Person of Bobby F. Chain, Jr., Plaintiff,
v.
The CITY OF ALLENTOWN, Wayne Stephens, Richard Schaffer, and Various Other Unknown Officers of the City of Allentown Police Department, Defendants.
Civ. A. No. 94-CV-4336.
United States District Court, E.D. Pennsylvania.
August 18, 1995.
*1402 *1403 *1404 Dennis F. Feeley, Carl B. Williamson, Allentown, PA, for plaintiff.
Blake C. Marles, David G. Knerr, Allentown, PA, for defendants.

OPINION AND ORDER
VAN ANTWERPEN, District Judge.
This civil rights action, brought pursuant to 42 U.S.C. §§ 1983, 1985, 1986 and the Eighth and Fourteenth Amendments to the United States Constitution, arises out of the attempted suicide of Bobby Chain Jr. while he was being held in a holding cell. The complaint also asserts supplemental state law claims. On July 18, 1992, Bobby Chain, Jr. attempted to hang himself using his socks in a holding cell at the Allentown, Pennsylvania Police Department. Plaintiff, Stephen A. Litz, Esq., Guardian for the Estate and Person of Bobby Chain Jr., seeks to recover damages resulting from the attempted suicide. There has been an opportunity for discovery and defendants have moved for summary judgment on all counts.

I. STATEMENT OF FACTS
On July 18, 1992, plaintiff's ward, Bobby F. Chain, Jr. ("Chain"), attempted to commit suicide while in custody in a holding cell at the lockup of the City of Allentown Police Department ("Department"). Chain was given medical attention and his death was prevented. Nevertheless, plaintiff alleges that the suicide attempt resulted in permanent brain damage to Chain, who has been adjudicated incapacitated. Plaintiff, Chain's guardian, seeks damages against defendants with respect to this suicide attempt.[1]
From 1981 to 1992, Chain was involved in over twenty (20) incidents with the Allentown Police Department. Nine of these incidents involved public drunkenness and resulted in Chain being held in custody until he became sober. Over the years, a number of officers of the Allentown Police Department became familiar with Chain.
In particular, Officers Charles Kulp and Douglas Marsteller were familiar with Chain. On the evening of July 17, 1992, they responded to a call for a hit and run accident and discovered Chain at a street corner in an intoxicated state. Officer Ronald Miller also responded to the call. Chain told the officers that he had been talking with the driver of a car which then pulled away and ran over his foot. Kelp arrested Chain for public drunkenness and took him into custody so he could be held until he became sober. Chain passively resisted, but with some coaxing, he was arrested without incident. Officer Kulp testified that he told Chain:
... you're pretty drunk you know. We have an obligation. We have a responsibility. *1405 And I told Ronnie we better arrest him for public drunk and take him in.
And we were trying to do it as peacefully as possible. I would say at that point that Bobby was a passive resister. He wasn't resisting overtly. He just was failing to respond to our commands. And he would remain stiff, was  we were trying to put him in the car.
And I just kept talking, Come on, Bobby, you know that we have got to do this, you know we have to. This is the way it is. Hey, you can sleep it off, couple of hours you'll be out of here. You know the way it works. You know the system....
Deposition of Officer Charles W. Kulp, 4/19/95 at 28-29. Officer Miller transported Chain to the city lockup.
At that time, Wayne Stephens was Chief of Police of the City of Allentown and responsible for all executive functions of the Department. Prior to Chain's arrest, the Allentown Police Department had implemented various policies in order to ensure the protection of prisoners. For example, police officers were required to remove prisoners' belts, excess clothing, shoelaces and personal effects. In addition, video cameras were installed in the cells.
At 1:57 a.m. on July 18, 1995, Sergeant Brad Fulmer was working in police headquarters when Chain was brought into the city lockup. He also was familiar with Chain. Pursuant to standard procedure, Chain's shoes, belt and personal effects were taken. Chain continued to be uncooperative until he was castigated by Fulmer.
At approximately 2:07 a.m., Chain was placed in a jail cell wearing his shirt, pants and two pairs of socks.
Defendant Officer Richard Schaffer was the duty officer at the lockup when Chain was placed in the holding cell. Like other officers, he had become familiar with Chain over a period of several years. Usually, the only prisoners who were held at the lockup for any period of time were intoxicated persons who were kept until they became sober. Other types of offenders were processed and released or moved to the County jail.
As duty officer, in addition to administrative duties, Schaffer was responsible for prisoners once they were brought into a cell. Department regulations require the duty officer to enter the holding cell area every thirty (30) minutes to observe each prisoner personally. If the prisoner has known suicidal tendencies or says he might try to commit suicide, physical checks are required every fifteen (15) minutes. In addition, the duty officer has, on his desk, a TV monitor for each cell in the holding area.
At around 2:15 a.m. or 2:20 a.m., while in the cell, Chain was hollering, banging on the walls, swearing, asking why he could not go home, and yelling about finding the officers' telephone numbers and addresses. Chain also made lewd comments and blew kisses at an Emergency Medical Technician who was in the area of the holding cell.
Through the monitor, Schaffer noticed Chain standing on the cell bench holding his shirt over the camera, yelling at the camera, and unsuccessfully trying to hang his shirt over the camera. It is difficult to hang anything over the camera because of its design. Schaffer testified he was about to go into Chain's cell when another officer presented him with paperwork. Schaffer did not enter the cell. Schaffer saw Chain on the monitor as he stepped off the bench, lost his balance, and "flopped down" on the end of the bench. Schaffer stated it did not appear that Chain was hurt. He then became quiet and lay down on the bench.
Deposition testimony revealed that when a prisoner touched one of the cameras in the cell, some of the officers would admonish the prisoner, take clothing away, threaten to shackle the prisoner, or actually shackle the prisoner to the cell bench, depending on the individual and whether the individual heeded the warnings. Schaffer, however, did not enter the holding cell nor did he admonish Chain. Rather, he began to perform some of his administrative duties.
When asked at his deposition if he had considered shackling Chain to the bench located in the cell, Schaffer responded in the negative, explaining
You can't keep them quiet. Because the ones you do end up shackling, they bang *1406 their head. They'll get  they have one hand free. You can't shackle both arms and legs. You can shackle one arm and one leg. They can  they can still bang on the walls and they do.
Deposition of Officer Richard Schaffer, 1/4/95 at 75.
At some point thereafter, Chain managed to block the camera, remove the two pairs of socks he was wearing, tie three of the socks in a loop around his neck and around a bar on the cell door, and hang himself.
From his position at the front desk, Schaffer saw a shirt over the camera and saw something tied to the cell bar. Schaffer then entered the cell block area and discovered Chain hanging by the socks in almost a sitting position.
With the assistance of other officers and Emergency Medical Technicians, Schaffer cut the socks and began emergency medical procedures. The Emergency Medical Technicians reported that they had been summoned at 2:30 a.m. Eventually, Chain was placed on a litter, taken to an ambulance and transported to a hospital. Chain survived the incident but is alleged to have suffered brain damage.
Plaintiff claims the City of Allentown, Stephens, Schaffer and various unknown officers violated Chain's constitutional rights under the Eighth and Fourteenth Amendments to the United States Constitution, and that compensation is due under 42 U.S.C. §§ 1983, 1985, and 1986. Plaintiff also asserts various tort claims against defendants under Pennsylvania law.
Lamentably, this is not the first time a prisoner has attempted to commit suicide at the Allentown Police Department. In 1986, a prisoner hung himself from a ceiling grate. In response, mesh was placed over the grate, and windows were cut into the cell block and the duty officer's wall so that the officer could see into the cell block area directly. In 1989, a prisoner hung himself in his cell by using his socks. In response, video cameras were placed in the cells, high intensity lighting was installed, and locks and doors were updated.[2] From 1989 to July 19, 1992, several other suicides were attempted but none were successful.
At the time of Chain's attempted suicide, the Department had implemented certain policies. When a prisoner was brought in, police officers would remove belts, excess clothing and shoelaces. As we noted, video cameras were in installed in the cells. The duty officer would personally observe each prisoner at certain intervals. If a person attempted or indicated a willingness to attempt a suicide, he would be placed on a fifteen (15) minute watch and Crisis Intervention would be called to take the person away to a mental health facility. If the duty officer left his desk, he was required to inform other officers so they could check the monitors in his absence. The duty officer and desk officer were not permitted to go out of headquarters for lunch.
The design of the video cameras was changed several times so they could not be covered. If a prisoner blocked or touched a video camera, that prisoner was to be shackled immediately to the bench in the cell in order to prevent the prisoner from damaging the camera, but also so the prisoner could not harm himself while the camera view was blocked.[3]
Plaintiff asserts that Department's existing suicide prevention policies were not properly enforced. In particular, plaintiff contends that defendants did not enforce their policy of removing all excess clothing, i.e., the second pair of socks Chain was wearing, and that Schaffer did not follow police procedure, i.e., did not shackle Chain after he touched a security camera. Plaintiff also asserts that *1407 Schaffer should have monitored Chain more closely.[4]
Plaintiff further alleges that other proposed department policies, which were rejected, would have prevented this incident. The rejected policies included a videotaping system; requiring that all prisoners' socks be removed; taking all prisoners' clothing and providing them with paper suits; and the installation of wire mesh on the bars of the cell door. Plaintiff suggests that if prisoners' socks or all of their clothing were routinely removed, Chain's attempted suicide could have been prevented. It is claimed that had a wire mesh been installed, Chain could not have attempted suicide in the manner he did.
City officials did consider putting mesh over the entire door to each cell so that prisoners could not use the bars, but found that the mesh reduced the visibility of the cell to an unacceptable level. City officials also considered stripping all prisoners naked and placing them in paper clothes and putting audio monitors into the cells, but these suggestions were also rejected.

II. STANDARD OF REVIEW
Rule 56(c) of the Federal Rules of Civil Procedure provides for summary judgment where the:
pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.
"The party moving for summary judgment must demonstrate that, under the undisputed facts, the non-movant has failed to introduce evidence supporting a necessary element of his case." In Re Phillips Petroleum Sec. Litig., 881 F.2d 1236, 1243 (3d Cir.1989), see also J.F. Feeser, Inc. v. Serv-A-Portion, Inc., 909 F.2d 1524 (3d Cir.1990), cert. denied, 499 U.S. 921, 111 S.Ct. 1313, 113 L.Ed.2d 246 (1991).
To defeat summary judgment, the non-moving party must respond with facts of record that contradict the facts identified by the movant and may not rest on mere denials. See Celotex Corp. v. Catrett, 477 U.S. 317, 321 n. 3, 106 S.Ct. 2548, 2552 n. 3, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(e)); see also First Nat'l Bank v. Lincoln Nat'l Life Ins. Co., 824 F.2d 277, 282 (3d Cir.1987). The non-moving party must demonstrate the existence of evidence that would support a jury finding in its favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49, 106 S.Ct. 2505, 2510-11, 91 L.Ed.2d 202 (1986).

III. DISCUSSION
Section 1983 provides for the imposition of liability on any person who, acting under color of state law, deprives another of rights, privileges, or immunities secured by the Constitution or the laws of the United States. 42 U.S.C. § 1983. The statute is not a source of substantive rights, but merely provides "a method for vindicating federal rights elsewhere conferred." Graham v. Connor, 490 U.S. 386, 393-94, 109 S.Ct. 1865, 1870, 104 L.Ed.2d 443 (1989).[5]
In conjunction with the Due Process Clause of the Fourteenth Amendment, section 1983 allows plaintiffs to assert three kinds of federal claims: (1) claims for the deprivation by state officials of any of the specific protections defined in the Bill of Rights; (2) claims under the substantive component of the Due Process Clause that bar certain arbitrary, wrongful government *1408 actions, regardless of the fairness of the procedures used to implement them; and (3) claims under the procedural component of the Due Process Clause relating to deprivations of life, liberty, or property without due process of law. See Zinermon v. Burch, 494 U.S. 113, 125, 110 S.Ct. 975, 983, 108 L.Ed.2d 100 (1990).
To state a claim under section 1983, a plaintiff must show both that (1) the offending conduct was committed by a person acting under color of state law, and (2) that such conduct deprived the plaintiffs of rights secured by the Constitution of the United States. Parratt v. Taylor, 451 U.S. 527, 535, 101 S.Ct. 1908, 1912-13, 68 L.Ed.2d 420 (1981), overruled in part on other grounds, Daniels v. Williams, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). In this case, no party disputes that defendants were acting under color of state law. Thus, the first issue we address is whether the plaintiff has sufficiently alleged a deprivation of a right secured by the Constitution. See Baker v. McCollan, 443 U.S. 137, 140, 99 S.Ct. 2689, 2692, 61 L.Ed.2d 433 (1979).
The Eighth Amendment does not apply to pretrial detainees, such as plaintiff. Bell v. Wolfish, 441 U.S. 520, 535 n. 16, 99 S.Ct. 1861, 1872 n. 16, 60 L.Ed.2d 447 (1979); Ingraham v. Wright, 430 U.S. 651, 671 n. 40, 97 S.Ct. 1401, 1412 n. 40, 51 L.Ed.2d 711 (1977). Eighth Amendment protections do not attach until after conviction and sentence. "Eighth Amendment scrutiny is appropriate only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions." Bell v. Wolfish, 441 U.S. at 535 n. 16, 99 S.Ct. at 1872 n. 16; Ingraham v. Wright, 430 U.S. at 671 n. 40, 97 S.Ct. at 1412 n. 40.
However, under the Due Process Clause of the Fourteenth Amendment, a detainee is entitled to, "at a minimum, no less protection for personal security than that afforded convicted prisoners under the Fourteenth Amendment and no less a level of medical care than that required for convicted prisoners by the Eighth Amendment." Colburn v. Upper Darby Township, 838 F.2d 663, 668 (3d Cir.1988), cert. denied, 489 U.S. 1065, 109 S.Ct. 1338, 103 L.Ed.2d 808 (1989) ("Colburn I").

A. Individual Defendants
Under the appropriate circumstances, a pretrial detainee's suicide can give rise to a section 1983 violation as an infringement of the Due Process Clause of the Fourteenth Amendment to the Constitution. See Simmons v. City of Philadelphia, 947 F.2d 1042, 1067 (3d Cir.1991), cert. denied, 503 U.S. 985, 112 S.Ct. 1671, 118 L.Ed.2d 391 (1992); Colburn v. Upper Darby Township, 946 F.2d 1017, 1023 (3d Cir.1991) ("Colburn II"); Williams v. Borough of West Chester, 891 F.2d 458, 464 (3d Cir.1989); Freedman v. City of Allentown, 853 F.2d at 1115; Colburn I, 838 F.2d at 667-70.
In the matter sub judice, the plaintiff relies upon the allegations that the defendants did not enforce their policy of removing all excess clothing by allowing Chain to keep his second pair of socks on, did not shackle Chain after he touched the security camera and did not monitor Chain closely enough.
"[T]he Due Process Clause is simply not implicated by a negligent act of an official." Daniels v. Williams, 474 U.S. 327, 328, 106 S.Ct. 662, 663, 88 L.Ed.2d 662 (1986) (emphasis in original). Section 1983 is not a "font of tort law to be superimposed upon whatever systems may already be administered by the States." State Bank of St. Charles v. Camic, 712 F.2d 1140, 1147 (7th Cir.), cert. denied, 464 U.S. 995, 104 S.Ct. 491, 78 L.Ed.2d 686 (1983); Parratt v. Taylor, 451 U.S. at 544, 101 S.Ct. at 1917; Paul v. Davis, 424 U.S. 693, 701, 96 S.Ct. 1155, 1160, 47 L.Ed.2d 405 (1976). Rather, liability requires "more than ordinary lack of due care for the prisoner's interests or safety." Whitley v. Albers, 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986).
The standard for prisoner medical care under the Eighth Amendment was articulated by the Supreme Court in Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Under Estelle, the plaintiff must establish a deliberate indifference on the part of municipal officials to a serious medical need in order to maintain an *1409 action for violation of his Constitutional rights. Id. 429 U.S. at 104, 97 S.Ct. at 291; see also Wilson v. Seiter, 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). The Third Circuit applied this standard to pretrial detainees in prison suicide cases in Boring v. Kozakiewicz, 833 F.2d 468, 472-73 (3d Cir.1987), cert. denied 485 U.S. 991, 108 S.Ct. 1298, 99 L.Ed.2d 508 (1988).
Under this standard, "a prison custodian is not the guarantor of a prisoner's safety." Freedman v. City of Allentown, 853 F.2d at 1115. A custodial official may be liable in damages for the suicide of a pretrial detainee only if he acts with "deliberate indifference" to the individual's psychological needs.[6]Colburn I, 838 F.2d at 668; Freedman v. City of Allentown, 853 F.2d at 1115.
The line between what constitutes mere negligence and what constitutes deliberate indifference for purposes of a Section 1983 constitutional claim can be difficult to draw. A denial of a reasonable request for medical treatment, an intentional refusal to provide known needed medical care, and a purposeful delay in providing this care have all been held to constitute deliberate indifference. Monmouth County Correctional Inst. Inmates v. Lanzaro, 834 F.2d 326, 346 (3d Cir.1987), cert. denied, 486 U.S. 1006, 108 S.Ct. 1731, 100 L.Ed.2d 195 (1988). On the other hand, allegations amounting only to malpractice or mere negligence have consistently been held not to raise issues of constitutional import. Id.; see also Estelle v. Gamble, 429 U.S. at 106 & n. 14, 97 S.Ct. at 292 & n. 14.[7]
In Colburn II, the Third Circuit established that a plaintiff in a prison suicide case has the burden of establishing three elements: (1) the detainee had a "particular vulnerability to suicide," (2) the custodial officer or officers knew of that vulnerability, and (3) those officers "acted with reckless indifference" to the detainee's particular vulnerability. Colburn II, 946 F.2d at 1023.[8]

1. Vulnerability to Suicide
The first part of the test requires "a strong likelihood, rather than a mere possibility, that self-inflicted harm will occur." Colburn II, 946 F.2d at 1024.
In this case, we can find no outward indications in the record that Chain was going to inflict harm on himself. On the contrary, Chain was yelling in the cell and asking why he could not go home. Later, he made lewd comments and blew kisses to a nearby Emergency Medical Technician. Lastly, he lay quietly on the bench. These actions do not indicate any possibility that *1410 Chain was going to harm himself. See e.g. Barber v. City of Salem, 953 F.2d 232 (6th Cir.1992) (fact that decedent expressed concern over job, his engagement and inability to obtain custody of his son after being arrested for DUI was not enough to alert authorities of strong likelihood of suicide); Bell v. Stigers, 937 F.2d 1340 (8th Cir.1991) (not enough when an intoxicated prisoner made comment about shooting himself when no gun was available); see also Estate of Cartwright v. City of Concord, 618 F.Supp. 722, 728 (N.D.Cal.1985), aff'd 856 F.2d 1437 (9th Cir.1988) (remark about committing suicide, apparently in jest, was not enough); see also Estate of Hocker v. Walsh, 22 F.3d 995 (10th Cir.1994) (intoxicated and incoherent detainee was not a particular suicide risk).
At no point did Chain talk about nor did he threaten to commit harm to himself. There was no history or marks exhibiting attempted suicides in the past. See, e.g., Colburn II, 946 F.2d at 1026 (vertical scar on forearm which might suggest a previous suicide attempt); Freedman v. City of Allentown, 853 F.2d at 1115 (failure to recognize large and prominent scars on the wrist, elbows and neck of detainee as suicide hesitation cuts and failure to take action to protect detainee was at most negligence, not deliberate indifference); but see Partridge v. Two Unknown Police Officers, 791 F.2d 1182 (5th Cir.1986) (deliberate indifference shown where prisoner exhibited hysterical and serious aberrant behavior, arresting officer was told by prisoner's father that prisoner suffered a mental breakdown, prisoner wore two medic alert bracelets, and jail records showed earlier attempted suicide).
Chain was familiar to several of the police officers for a substantial period of time and never had been known to have any suicidal tendencies. The record does not indicate that Chain acted in a peculiar manner on the date of his attempted suicide or that Chain ever possessed a "particular vulnerability" to suicide. See Popham v. City of Talladega, 908 F.2d 1561 (11th Cir.1990) (police had no knowledge of danger because detainee was known to police department and never threatened suicide).
In the absence of any of these or similar factors, we must conclude that the first prong has not been met and find that plaintiff has not shown Chain had a "particular vulnerability" to suicide.

2. Official Knowledge
Under current law, the second prong of Colburn II is met only when an official has a subjective awareness of a substantial risk of serious harm. Thus, a plaintiff must show actual awareness of the risk, not just that the risk would have been perceived by an objective, reasonable person. Farmer v. Brennan, ___ U.S. ___, ___, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994).[9] "The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. ___ U.S. at ___, 114 S.Ct. at 1979.[10]
Here, plaintiff has not produced or pointed to any evidence whatsoever that the police officers were actually aware of any risk of serious harm. At most, they have demonstrated that Chain was drunk. However, the mere fact of intoxication, not buttressed by other factors, is not recognized "as a factor sufficient to trigger the duty to guard against self-inflicted injury." Colburn II, 946 F.2d at 1026; see, e.g., Belcher v. Oliver, 898 F.2d 32, 34 (4th Cir.1990) (no duty to protect when intoxicated and no reason to believe self-inflicted harm would follow); Burns v. City of Galveston, 905 F.2d 100, 104 (5th Cir.1990); State Bank of St. Charles v. Camic, 712 F.2d at 1146 (no reason to suspect suicidal tendencies when decedent *1411 was merely intoxicated and uncooperative).
Thus, plaintiff has also failed to meet the second prong of the Colburn II test. Accordingly, summary judgment must be granted in favor of all the individual police officers and against the plaintiff.[11]

B. Municipal and Supervisory Liability
Plaintiff also brings section 1983 claims against the City of Allentown and Police Chief Richard Stephens. A municipality can be sued directly under section 1983 if action pursuant to a municipal policy, practice or custom causes a constitutional tort. Monell v. New York City Dep't of Social Services, 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978); Fagan v. City of Vineland, 22 F.3d at 1291; Simmons v. City of Philadelphia, 947 F.2d at 1063. A municipality or a supervisor, however, cannot be held liable solely because it employs a tortfeasor. There is no respondeat superior liability under Section 1983. Monell, 436 U.S. at 691, 98 S.Ct. at 2036. "Instead, it is when execution of a government's policy or custom ... inflicts the injury that the government as an entity is responsible under § 1983." Id. 436 U.S. at 694, 98 S.Ct. at 2037-38.

1. City of Allentown
In City of Los Angeles v. Heller, 475 U.S. 796, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986) (per curiam), the Supreme Court held that a municipal entity cannot be held liable for failing to train or supervise a police officer where there is no underlying constitutional violation by the individual officer. The Court, in reversing a jury decision, held "if a plaintiff has suffered no constitutional injury at the hands of the individual police officer, the fact that departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point." Heller, 475 U.S. at 799, 106 S.Ct. at 1573; see Williams v. Borough of West Chester, supra (municipal liability claims dismissed where individual officer was exonerated).[12] Here, since we have already found that the individual defendants did not violate Chain's constitutional rights, we also find that, under Heller, the City of Allentown is not liable.
Even if we had found that the individual officials were liable or that summary judgment under Heller was inappropriate for other reasons, the record before us would still compel us to grant summary judgment in favor of the City of Allentown. A municipality may be liable for failure to train its police officers when that failure "amounts to deliberate indifference to the rights of persons with whom the police come into contact." City of Canton, 489 U.S. at 388, 109 S.Ct. at 1204. However, as the Supreme Court stated, it does not
suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of *1412 the program to enable officers to respond properly to the usual and recurring situations with which they must deal. And plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable.
Id., 489 U.S. at 391, 109 S.Ct. at 1206.
Plaintiff claims that other policies which would have prevented this incident were rejected. These policies include: videotaping of the cells; requiring that all prisoners, socks be removed; taking all prisoners' clothing and providing them with paper suits; and the installation of wire mesh on the bars of the cell door. As we noted, plaintiff argues that Chain's attempted suicide would have been prevented if his socks had been taken away and if mesh had been installed on the cell door.
Defendants reply that these alternatives were considered but rejected for good reasons. Defendants considered the alternative of taking all of the prisoners' clothing to be inconvenient and costly, especially in cases where the police were merely holding intoxicated individuals who were to be released when they became sober. Mesh on the cell doors was not implemented because it would restrict visibility into the cell.
Plaintiff claims that defendants engaged in a unconstitutional custom, practice or policy. In order to make a claim under § 1983, plaintiff must show the policymakers were aware of (1) the risk of suicides in city lockups, and (2) feasible alternatives for preventing them, and that they either (a) deliberately chose not to pursue those alternatives, or (b) acquiesced in a long-standing policy or custom of inaction. Simmons v. City of Philadelphia, 947 F.2d at 1067; Gunn v. City of Allentown, 1992 WL 191144 at 4.[13]
Plaintiff also claims that defendants engaged in a failure to train, instruct and supervise. The Third Circuit has established a two part test in prison suicide cases where a plaintiff alleged inadequate safety policies or failure to train. Liability can be imposed "only where there are both (1) contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents, and (2) circumstances under which the supervisor's inaction could be found to have communicated a message of approval to the offending subordinate." Colburn I, 838 F.2d at 673 (citing Chinchello v. Fenton, 805 F.2d 126, 133 (3d Cir.1986)); see also Freedman v. City of Allentown, 853 F.2d at 1117 (outlining two-pronged test).
Only two successful suicides had occurred since 1986. The municipality was also aware of a number of attempted suicides which were not successful. We do not believe that the municipality somehow communicated a message of tacit approval or acquiescence. Rather, express policies were implemented such as the removal of excess clothing, and checking on detainees at certain intervals to prevent these incidents. In Gunn v. Allentown, supra, these policies were determined to be effective when a similar suicide claim against the City of Allentown was made.
Following the second successful suicide, further safety measures were implemented. Video cameras were installed, high intensity lighting was installed between cells, and locks and doors were updated. In addition, the duty officer and desk officer were not permitted to leave the headquarters for lunch.[14]
In Williams v. Borough of West Chester, the Third Circuit held that plaintiff's claims at most amounted to allegations of negligence where the plaintiff claimed that the municipality had violated the decedent's *1413 rights by failing to require the removal of detainees' belts, install visual surveillance equipment in the cell block area, allocate funds for the treatment of detainees with mental health problems, and train officers in the handling of such detainees. 891 F.2d at 467 n. 14. In the case at bar, the City of Allentown has already taken steps well beyond those in Williams.
We hold, therefore, that the failure of the City of Allentown to adopt the additional measures identified by plaintiff can at most amount to mere negligence, which falls short of the threshold for stating a Section 1983 claim.
In our determination of whether municipal officials breached a constitutional duty to a pretrial detainee, we are very hesitant to second guess "[t]he wide range of `judgment calls' that meet constitutional and statutory requirements [and] are confided to officials outside of the Judicial Branch of Government." Bell v. Wolfish, 441 U.S. at 562, 99 S.Ct. at 1886; Simmons v. City of Philadelphia, 947 F.2d at 1068. We do not desire to hinder the flexibility and full and frank discussions necessary for potential future improvements of police policies and procedures. Jails should be run by those who are charged with the duty to run them and not by Federal Judges or lawyers.

2. Police Chief Stephens
To sustain a § 1983 claim against Police Chief Stephens, plaintiff would have to show that some affirmative conduct by him played a role in the alleged unconstitutional conduct. Rizzo v. Goode, 423 U.S. 362, 377, 96 S.Ct. 598, 607, 46 L.Ed.2d 561 (1976). This necessary involvement can be established either of two ways: "through allegations of personal direction or actual knowledge and acquiescence," or through proof of direct discrimination by the supervisor. Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir.1988); see also Keenan v. City of Philadelphia, 983 F.2d 459 (3d Cir.1992); Andrews v. City of Philadelphia, 895 F.2d 1469, 1478 (3d Cir.1990).
"[A] `person' is not the `moving force [behind] the constitutional violation' of a subordinate, unless that `person' ... has exhibited deliberate indifference to the plight of the person deprived." Sample v. Diecks, 885 F.2d 1099, 1118 (3d Cir.1989). To hold a supervisory official such as Stephens liable, plaintiff must: 1) identify with particularity what the supervisory official failed to do that demonstrates his deliberate indifference; and 2) demonstrate a close causal relationship between the identified deficiency and the ultimate injury. Id.
Applying the above standards, and based on our earlier discussion regarding municipal liability, we find that the plaintiff has not met the Third Circuit's specific criteria for imposing supervisory liability. Specifically, plaintiff has not shown deliberate indifference. Furthermore, plaintiff has not shown that Stephens engaged in any unconstitutional custom, practice or policy or that Stephens failed to train, instruct and supervise in violation of § 1983. As with the claims against the City of Allentown, we hold that any improper action or inaction identified by plaintiff can at most only amount to negligence.

C. Section 1985 and 1986 Claims
Plaintiff also brings claims under 42 U.S.C. §§ 1985 and 1986.[15] In order to state *1414 a cause of action for violations of this section, the following must be alleged: (1) a conspiracy by the defendants; (2) designed to deprive plaintiff of the equal protection of the laws; (3) the commission of an overt act in furtherance of that conspiracy; (4) a resultant injury to person or property or a deprivation of any right or privilege of citizens; and (5) defendants' actions were motivated by a racial or otherwise class-based invidiously discriminatory animus. See Griffin v. Breckenridge, 403 U.S. 88, 102-103, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971); Robison v. Canterbury Village, Inc., 848 F.2d 424, 430 (3d Cir.1988) (racial or other prohibited animus necessary element of Section 1985(3) claim; section 1986 claim companion to Section 1985(3) claim); Pratt v. Thornburgh, 807 F.2d 355, 357 (3d Cir.1986).
In this case, plaintiff has not shown a genuine issue of material fact exists regarding the defendants motivation by racial or otherwise class-based invidiously discriminatory animus, along with the other requisite elements of a section 1985(3) conspiracy claim. Nor has plaintiff produced or pointed to any evidence supporting allegations of racial or other prohibited animus. Plaintiff may not rest on the mere allegations in its complaint. See, Fed.R.Civ.P. 56(e). Therefore, we will grant defendants' motion for summary judgment regarding plaintiff's section 1985(3) claim and Section 1986 claims.[16]

D. Pendent State Law Claims
Since all federal claims against the defendants have now been dismissed, the decision to entertain or dismiss the pendent state law claims is within our discretion.[17] Courts should ordinarily decline to exercise supplemental jurisdiction over state law claims when the federal claims are dismissed. See United Mine Workers v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); Angst v. Mack Trucks, Inc., 969 F.2d 1530, 1535 (3d Cir.1992) Weaver v. Marine Bank, 683 F.2d 744, 746 (3d Cir.1982). "[O]nce all federal claims have been dropped from a case, the case simply does not belong in federal court." Lovell Mfg. v. Export-Import Bank of the United States, 843 F.2d 725 (3d Cir.1988). "[I]f the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." United Mine Workers v. Gibbs, 383 U.S. at 726, 86 S.Ct. at 1139; see Robison v. Via, 821 F.2d 913, 925 (2d Cir.1987). Therefore, the state law claims are dismissed. Of course, plaintiff has the option to refile these claims in state court.

IV. CONCLUSION
For the reasons set forth in the foregoing Memorandum, Defendants' Motion for Summary Judgment is granted. Judgment shall be entered in favor of all defendants and against plaintiff on all federal claims. Plaintiff's pendent state law claims are dismissed without prejudice to plaintiff's right to pursue these claims in state court. An appropriate order follows.

ORDER
AND NOW, this 18th day of August, 1995, upon consideration of Defendants' Motion for Summary Judgment, filed on June 30, 1995, and Plaintiff's Response to this Motion, filed on September July 20, 1994, and Defendants' letter to the Court dated August 8, 1995, it is hereby ORDERED consistent with the foregoing opinion as follows:
1. Defendants' Motion for Summary Judgment is GRANTED.

*1415 2. Judgment is entered in favor of all Defendants and against Plaintiff on all federal claims.
3. Plaintiff's pendent state claims are DISMISSED WITHOUT PREJUDICE to Plaintiff's right to pursue these claims in state court.
4. This case is CLOSED.
NOTES
[1] Plaintiff brings this suit against: The City of Allentown, and in their official capacities: Chief of the Allentown Police Department Wayne T. Stephens, Officer Richard Schaffer of the Allentown Police Department, and Various Unknown Officers of the City of Allentown Police Department.
[2] The executors for these persons filed suit, unsuccessfully, against the City and others claiming civil rights violations. See Freedman v. City of Allentown, 651 F.Supp. 1046 (E.D.Pa.1987), aff'd, 853 F.2d 1111 (3d Cir.1988); Gunn v. City of Allentown, 1992 WL 191144 at 6 (E.D.Pa. 1992), aff'd, 993 F.2d 224 (1993).
[3] Although the existence of this procedure is disputed, for the purposes of this motion, we resolve it in favor of the plaintiff and proceed as if the policy existed. We have resolved any other disputed facts in a similar fashion.
[4] Paragraph 39 of the complaint sets forth a litany of allegations including: all prisoners' personal effects should have been removed; prisoners should not be permitted to block video cameras; prisoners should be in a facility where they could adequately be observed; officers should not be allowed to perform other duties while responsible for prisoners; officers failed to check the status of the prisoners in a timely manner; and the municipality failed to take adequate steps to prevent suicides.
[5] We note that in light of plaintiff's right to proceed under section 1983 for any constitutional violations that can be established, it would be redundant and a waste of judicial resources to permit the adjudication of both direct constitutional and section 1983 claims. See Rogin v. Bensalem Township, 616 F.2d 680, 686-87 (3d Cir.1980), cert. denied, 450 U.S. 1029, 101 S.Ct. 1737, 68 L.Ed.2d 223 (1981). Accordingly, we shall enter judgment against plaintiff on all direct claims.
[6] Although the Third Circuit has adopted a "shocks the conscience" test pursuant to Collins v. City of Harker Heights, 503 U.S. 115, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992), it has not disavowed its earlier decisions applying a reckless disregard/deliberate indifference inquiry to those cases in which a plaintiff is in custody. Fagan v. City of Vineland, 22 F.3d 1283, 1291 (3d Cir. 1994) (en banc); see also Simmons v. City of Philadelphia, 947 F.2d at 1067; Colburn II, 946 F.2d at 1024; Williams v. Borough of West Chester, 891 F.2d at 464 & n. 10; Colburn I, 838 F.2d at 668. We will apply the deliberate indifference standard although the same result would be obtained under the "shock the conscience" standard.
[7] See e.g., Williams v. Borough of West Chester, supra, (failure to follow general practice of removing detainee's belt or perform thirty-minute checks on prisoners was simply negligent conduct); State Bank of St. Charles v. Camic, 712 F.2d 1140, 1146 (7th Cir.1983) (failure to check cells in accordance with established procedures does not evince deliberate disregard); Plasko v. City of Pottsville, 852 F.Supp. 1258 (E.D.Pa. 1994) (fact that officers did not secure a belt from decedent while he was in the holding cell, without any reason to believe that decedent was potentially suicidal, does not amount to a level of culpability higher than mere negligence); Williams v. City of Lancaster, 639 F.Supp. 377, 383-84 (E.D.Pa.1986) (failure to check on decedent for forty-five minutes because officer was assigned to horse feeding task, in violation of a rule requiring that prisoners be checked every thirty minutes, coupled with the lack of video surveillance equipment, was mere negligence under the circumstances).
[8] We will not attempt to distinguish among the various terms connotating a standard greater than negligence such as "reckless indifference," "deliberate indifference," "gross negligence," or "reckless disregard". We use the term "deliberate indifference" to refer to the type of conduct or state of mind usually described by the above terms collectively. See Plasko, 852 F.Supp. at 1263 n. 4; see also Farmer v. Brennan, ___ U.S. ___, ___, 114 S.Ct. 1970, 1978, 128 L.Ed.2d 811 (1994); Colburn II, 946 F.2d at 1024.
[9] This subjective test applies only to municipal officials. Farmer did not alter the objective test for municipal entities. See City of Canton v. Harris, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).
[10] The previous "knew or should have known" standard required something more culpable of the officer than mere negligence. Even the old test required that the strong likelihood of suicide be "so obvious that a lay person would easily recognize the necessity for" preventive action. See Colburn II, 946 F.2d at 1024-1025; Monmouth County Correctional Inst. Inmates v. Lanzaro, 834 F.2d at 347.
[11] Although it would be appropriate for us to find the officers are entitled to immunity at this stage of the proceedings, because we grant summary judgment on other grounds, we need not reach this issue. Government officials performing discretionary functions are entitled to qualified immunity, "shielding them from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." Anderson v. Creighton, 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987); Mitchell v. Forsyth, 472 U.S. 511, 530, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985) (allowing for the elimination of "meritless actions against public officials at the earliest possible stage in the litigation"); Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); Czurlanis v. Albanese, 721 F.2d 98, 108 (3d Cir.1983).
[12] Of course we are aware that in certain limited instances a municipality can be held independently liable for violating a plaintiff's constitutional rights even if there is no individual liability on the part of the officer. The Third Circuit held that in a § 1983 substantive due process claim arising out of a police pursuit, an underlying constitutional tort can still exist against the city, even if no individual officer violated the Constitution. Fagan v. City of Vineland, 22 F.3d 1283, 1292 (3d Cir.1994). In Fagan, the claims were "based on different theories and require proof of different actions and mental states," and thus a finding of municipal liability could not automatically hinge upon the liability of any one police officer. Id.
[13] Simmons involved a detainee who committed suicide. The jury found that the turnkey responsible for supervising the decedent had not violated the decedent's due process rights, but found the city had done so through a policy of improper training. On appeal, the Third Circuit upheld these verdicts, reasoning that the verdicts were consistent because the city's policymakers, rather than the turnkey, were the city actors whose primary liability must be established in order to hold the city liable under section 1983 for a failure to train. 947 F.2d at 1063.
[14] An indication of the effectiveness of the suicide prevention procedure is that Chain's life was at least saved by the efforts of the officers and individuals present.
[15] 42 U.S.C. § 1985(3) provides, in relevant part:

(3) If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws;
. . . . .
in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.
Although plaintiff has not taken the time to specify which provisions of section 1985 form the basis for his action, we will construe his claims as brought under section 1985(3) which deals with the deprivation of a person's rights or privileges. Section 1985(1) concerns conspiracies to obstruct officers from performing their duties and section 1985(2) pertains to conspiracies to intimidate witnesses or otherwise obstruct justice. See 42 U.S.C. § 1985(1), 1985(2). It is clear that section 1985(3) is the only applicable section in this action.
[16] Plaintiff also asserts claims under 42 U.S.C. § 1986, as the companion statute to 42 U.S.C. § 1985. Because no claim can be maintained under section 1986 unless a cause of action has been established under section 1985, see Rogin v. Bensalem Township, 616 F.2d at 696, we must also grant defendant's motion for summary judgment to plaintiff's section 1986 claims.
[17] 28 U.S.C. § 1367 codified the common law abstention doctrines and reads in relevant part: (c) The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if (3) the district court has dismissed all claims over which it has original jurisdiction. 28 U.S.C. § 1367.