Ruth AROCHO, As Administratrix of
the Estate of Enrique Rene Veras and
Wadays Veras and Ruth Arocho as
Parent and Guardian of Crystal Veras
and Yashera Veras, Appellants

v.

COUNTY OF LEHIGH
and Dale Meisel.

Commonwealth Court of Pennsylvania.

Argued Dec. 13, 2006.
Decided May 3, 2007.

David L. Deratzian, Bethlehem, for appellants.

Rudolph Zieger, Thomas M. Caffrey, Allentown, for appellees.

BEFORE: COLINS, President Judge, McGINLEY, Judge, PELLEGRINI, Judge, LEADBETTER, Judge, COHN JUBELIRER, Judge, SIMPSON, Judge, and LEAVITT, Judge.

OPINION BY Judge LEAVITT.

The children and estate (Estate) of Enrique Veras (Decedent),[1] who committed suicide while incarcerated at the Lehigh County Prison (Prison) on December 5, 2002, appeal a judgment of the Court of Common Pleas of Lehigh County (trial court). By this judgment, the trial court held that the Estate could not sustain its 42 U.S.C. § 1983 action for damages against Dale Meisel, the Prison Warden, or against Lehigh County for their alleged violations of Decedent's constitutional rights. In this case we consider whether the trial court erred by holding, as a matter of law, that neither Meisel nor Lehigh County acted with "deliberate indifference" to Decedent's particular vulnerability to suicide while he was incarcerated in the Prison.

### Suicide Prevention Policy

Because it is central to the outcome of this case, we begin with an overview of the Prison's Suicide Prevention Policy (Policy), which became effective on April 20, 2001. The stated purpose of the Policy is "[t]o provide written procedures regarding Lehigh County Prison's suicide prevention program in order to protect inmates from self-harm or death." Reproduced Record at 59a (R.R. ___). The Policy is also designed to "provide special housing, increased levels of observation, and medical restraint to those inmates who display self-destructive behavior." *Id.* All inmates are evaluated, and any inmate identified as a potential suicide risk is further evaluated by a nurse or psychiatrist. If the evaluator determines that the inmate requires an increased level of care, then the inmate can be placed on one of three levels of increased observation: "close observation," "suicide precaution" or "medical restraints." R.R. 60a–61a.

The minimum level of observation is "close observation" status. Close observation includes a periodic check on an inmate's behavior. Observations are documented by the Housing Unit Officer on a Psychiatric Check Report, which is submitted to the Medical Department[2] at the end of each shift. Medical staff review the check reports each shift for any significant changes in behavior.

---

1. Appellant Ruth Arocho is the administratrix of Decedent's estate and the mother of Decedent's minor children, Crystal Veras and Yashera Veras. Appellant Wadays Veras is Decedent's adult child.

2. "Medical Department" refers to Wexford Health Sources, which is the independent medical provider at the Prison. Wexford Health Sources is not a party to this action.

"Suicide precaution" status is the intermediate level of observation under the Policy. An inmate on suicide precaution is housed in an open-barred cell clothed only in a blanket, and is periodically checked by a guard. Specifically, the Policy sets the following monitoring and housing requirements for an inmate on suicide precaution status:

a) The Housing Unit Officer shall issue a heavy blanket in good structural condition to the inmate.

b) The Nurse shall place the inmate on Finger Foods/No Utensil status.

c) The Housing Unit Officer shall offer a daily shower to the inmate and directly supervise the inmate showering.

d) The Housing Unit Officer shall monitor the inmate at irregular fifteen-minute intervals (no more than fifteen minutes between checks). The checks are staggered so that there is no predictable pattern for the inmate to use in planning suicide.

e) The Housing Unit Officer shall document suicide checks on the psychiatric check form and submit it to the medical department at the end of each shift.

f) Medical staff will review the check report each shift for any significant changes in behavior.

g) Medical staff will have daily contact with the inmate.

h) In the event of an official visitor (i.e. attorney, parole official) the inmate will be dressed and escorted to the appropriate visit area and remain under direct visual observation by the escorting officer.

R.R. 60a.

The Policy's most restrictive level of observation requires physical restraint when ordered by a physician. An inmate who exhibits extreme behavior potentially or actually harmful to himself or to others may be placed in a restraint chair. The use of "medical restraints" is subject to the following conditions in the Policy:

a) The [restraint chair] is the only approved form of medical restraint.

b) Staff supervising the placing of an inmate into the Restraint Chair must be trained in its use.

c) Medical personnel must check the initial application of restraints to ensure circulation is not impaired.

d) The inmate will be dressed in clothing appropriate to temperature unless otherwise specified by the mental health order.

e) Medical staff shall make an assessment every two hours of the inmate's behavior, position, restraints, and health care needs (food, water, elimination and cleanliness) and ensure the needs are met.

f) The Housing Unit Officer shall monitor the inmate at irregular fifteen-minute intervals (no more than fifteen minutes between checks).

g) The Housing Unit Officer shall document medical restraint checks on a Psychiatric Check Report Form and submit them to the Medical Department at the end of each shift.

h) Medical staff will review the check report each shift for any significant changes in behavior.

i) The Housing Unit Officer shall document each time the inmate is released from medical restraints, or the reason for not releasing the restraints.

j) Medical restraint orders shall not exceed 24 hours.

k) Medical restraints shall not be removed without a physician's order with the following exception. The Housing Unit Officer shall remove

the restraints every two hours for ten minutes unless the inmate is extremely agitated. The inmate must be monitored continuously when out of medical restraints.

R.R. 61a.

Dale Meisel began working at the Prison in 1989 and became warden in February 2002. He would later testify by deposition that he had no specific recollection of writing the Policy that was in place at the time of Decedent's suicide. Meisel Deposition, August 29, 2005, at 44 (Meisel Depo. ___). Meisel acknowledged, however, that as warden he is responsible for promulgating all policies for the prison, which are then co-signed by the Director of Corrections for Lehigh County, in this case Edward Sweeney. *Id.* at 50.[3] Meisel is also responsible for training correctional officers and for enforcing all Prison policies.

In their depositions, Meisel and Sweeney acknowledged that the open-barred cell used to house suicidal inmates has points that can be used by a suicidal inmate to hang himself. Nevertheless, they did not believe a solid plastic wall was preferable. The inmate could scratch the wall until it was opaque and difficult to see through. In addition, a solid wall would impede the ability of guards to hear what an inmate was doing. Meisel Depo. 84–85, 114–115; Sweeney Deposition, September 8, 2005, at 54, 101 (Sweeney Depo. ___); Supplemental Reproduced Record at 14b–15b; 25b–26b; 35b; 49b (S.R.R.___).

### Decedent's Incarceration and Suicide

Decedent's first period of incarceration was from February 2002 until April 2002. Upon his incarceration Decedent was immediately placed on suicide precaution status. Decedent attempted to hang himself with a makeshift rope on February 11, 2002, and remained on suicide precaution status until February 21, 2002, when he was downgraded to close observation status. Decedent was removed from close observation status on February 25, 2002. He was returned to suicide precaution status on March 30, 2002, and remained on that status until he was released from the Prison on April 2, 2002.

Decedent returned to Prison on October 27, 2002, and was placed on suicide precaution status. After he engaged in self-injurious behavior, he was placed in a restraint chair with the authorization of the Medical Department and remained on suicide precaution status. On October 28, 2002, Decedent attempted to hang himself by tying a strip of blanket around his neck and attaching it to the cell bars. He was again placed in a restraint chair. On November 4, 2002, Decedent was transferred to the Mental Health Unit where he remained on suicide precaution status until November 14, 2002.

On December 4, 2002, Decedent became enraged upon learning he was being switched to a different cell in the Mental Health Unit and began engaging in self-injurious behavior. He was placed in a "suicide precaution cell," specifically Cell 3223, in the Administrative Segregation/Disciplinary Segregation Unit.[4] A cell

---

3. The Policy at issue in this case was signed by Edward Sweeney on April 20, 2001. Sweeney was not named as a defendant in the Estate's Section 1983 action.

4. There are three correctional officers assigned to the Administrative Segregation/Disciplinary Segregation Unit, in contrast to other units of the Prison where only one cor-

rectional officer is assigned. One of the three officers is assigned to the control booth and the other two officers are responsible for walking the pod. The correctional officer in the booth is responsible for monitoring an inmate who, pursuant to the Policy, requires observation. All three of the correctional officers are responsible for observing a potentially suicidal inmate. *See* Meisel Depo. 76–

is designated a "suicide precaution cell" based upon the recommendations of both custody staff and treatment staff; must be subject to the best available sight line from the control booth; and must be an "open bar" cell. Meisel Depo. 71; R.R. 125a. After he was placed in Cell 3223, Decedent attempted to hang himself by tying his underwear to a towel bar. Accordingly, the Medical Department directed officers to remove Decedent's clothing, gave him a blanket and placed him in a restraint chair from 8:45 p.m. to 9:00 p.m. Officers attempted to remove Decedent from the chair between 10:30 p.m. and 10:45 p.m., but Decedent refused and stated that he would harm himself. The Medical Department placed Decedent on suicide precaution status at 11:18 p.m. Decedent was removed from the restraint chair at 12:30 a.m. on December 5, 2002, and a mattress, after first being examined by an officer, was placed in Cell 3223. Officers checked Decedent every 30 minutes from 12:00 a.m. to 7:30 a.m., and thereafter every 15 minutes until 4:00 p.m. At 4:10 p.m. Decedent was found standing with his back to the cell door and with a piece of bed linen tied around his neck and attached to the cell door. Decedent was transferred to the hospital and pronounced dead at 4:54 p.m.

### Prior Incidents

According to Meisel and Sweeney, approximately 6,500 inmates pass through the Prison every year. Meisel Depo. 94; Sweeney Depo. 107. The Estate's evidence confirmed this figure. S.R.R. 172b–

173b. Three inmates have committed suicide since the Prison opened in 1992. Meisel Depo. 32, 42. The first successful suicide was in 1995, when an inmate took his own life by hanging. S.R.R. 159b. Decedent's suicide was the second. The third incident occurred in 2003 or 2004, after Decedent's suicide. Meisel Depo. 42. Additionally, the Estate's evidence showed that between February 7, 2000, and October 28, 2002, there were five suicide attempts, including Decedent's first attempt to hang himself. S.R.R. 159b–169b.

### Procedural History

The Estate filed a civil action under 42 U.S.C. § 1983 against Meisel and Lehigh County on December 10, 2004, alleging, *inter alia*, that "the policies and practices of the County of Lehigh were the direct and proximate cause of the constitutional harm caused to [Decedent]." Complaint, ¶ 12.[5] The Estate sought compensatory damages from Meisel, in his supervisory capacity as Warden, and from Lehigh County under a theory of municipal liability. The Estate also requested that the trial court declare the Policy unlawful and enjoin its continued use. Meisel and Lehigh County moved for summary judgment, which the trial court initially denied on January 3, 2006. Upon reconsideration, the trial court heard oral argument and granted summary judgment in favor of Meisel and Lehigh County on April 26, 2006. The Estate now appeals the trial court's order.

On appeal,[6] the Estate argues that the trial court erred in granting summary

---

77; Sweeney Depo. 66–67. If the officer assigned to the booth cannot observe the inmate, one of the other correctional officers on the pod is required to go to the cell and check on the inmate.

5. The complaint pled wrongful death and survivor actions under 42 Pa.C.S. §§ 8301–8302, as well as violations of the First, Fourth, Fifth, Eighth and Fourteenth Amendment to

the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution. By the time the judgment in favor of Meisel and Lehigh County was entered, only the Eighth and Fourteenth Amendment claims remained in litigation.

6. In reviewing a trial court's order granting summary judgment, "[a]n appellate court may disturb the order of the trial court only

judgment to Meisel and Lehigh County. The Estate argues that its evidence, an expert report, raised a factual question of whether the procedures in effect at the prison were "constitutionally infirm." Estate's Brief at 3. Thus, the question of whether Meisel and Lehigh County responded with "deliberate indifference" to Decedent's vulnerability to suicide must be decided by a jury. The Estate also contends that the trial court impermissibly relied upon oral deposition testimony in granting summary judgment. *Borough of Nanty–Glo v. American Surety Co. of New York*, 309 Pa. 236, 163 A. 523 (1932). We consider these questions *seriatim*.

### Eighth Amendment Prison Standards

■ The gravamen of the Estate's action is that Meisel and Lehigh County subjected Decedent to cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution, made applicable to the states by the Fourteenth Amendment.[7] *Estelle v. Gamble*, 429 U.S. 97, 101, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The prohibition against cruel and unusual punishment is broad enough to proscribe "deliberate indifference to serious medical needs of prisoners [that] constitutes the 'unnecessary and wanton infliction of pain.' " *Id.* at 104, 97 S.Ct. 285 (citation omitted). Accordingly, "deliberate indifference to a prisoner's serious illness or injury states a cause of action under [42 U.S.C. § ] 1983." *Id.* at 105, 97 S.Ct. 285

A serious medical need can include a psychiatric one. In *Colburn v. Upper Darby Township*, 838 F.2d 663 (3d Cir. 1988) (*Colburn I* ), it was held that an inmate's "particular vulnerability to suicide" represents a "serious medical need" as that term was defined in *Estelle*. Subsequently, the Third Circuit articulated a standard for prison suicide cases as follows:

> [A] plaintiff in a prison suicide case has the burden of establishing three elements: (1) the detainee had a "particular vulnerability to suicide," (2) the custodial officer or officers knew or should have known of that vulnerability, and (3) those officers "acted with reckless indifference" to the detainee's particular vulnerability.

*Colburn v. Upper Darby Township*, 946 F.2d 1017, 1023 (3d Cir.1991)(*Colburn II* ). The *Colburn II* court explained that the terms "reckless indifference" and "deliber-

---

where there has been an error of law or a manifest abuse of discretion. Notwithstanding, the scope of review is plenary and the appellate court shall apply the same standard for summary judgment as the trial court." *Cooper v. Delaware Valley Medical Center*, 539 Pa. 620, 632, 654 A.2d 547, 553 (1995). Summary judgment may be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. PA. R.C.P. No. 1035.2; *Limbach Co., LLC v. City of Philadelphia*, 905 A.2d 567, 572 (Pa.Cmwlth.2006). The record must be viewed in the light most favorable to the opposing party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. *Id.* at 573. Summary judgment is proper only when the facts are so clear that reasonable minds cannot differ. *Id.*

7. The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. CONST. amend. VIII. The Fourteenth Amendment provides, in pertinent part: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1.

ate indifference" are interchangeable. *Id.* at 1024. It declined to precisely define "deliberate indifference," but noted that "a level of culpability higher than a negligent failure to protect from self-inflicted harm is required and that this requirement is relevant to an evaluation of the first two ... elements as well as the third." *Id.*

Three years after *Colburn II* was decided, the United States Supreme Court offered its first articulation of "deliberate indifference" for purposes of its Eighth Amendment jurisprudence. In *Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994),[8] the Supreme Court rejected an objective test for deliberate indifference, such as that adopted by the Third Circuit in *Colburn II*. Instead, the Court borrowed the concept of subjective recklessness from criminal law and held that

> a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official *knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.* ...

*Id.* at 837, 114 S.Ct. 1970 (emphasis added).[9] The Court explained further that "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844, 114 S.Ct. 1970.

In establishing a subjective test, the Supreme Court drew on precedent holding that the constitutional deprivation had to be obvious and that the prison official must have "a sufficiently culpable state of mind." *Id.* at 834, 114 S.Ct. 1970. Further, that state of mind must be "more blameworthy than negligence." *Id.* at 835, 114 S.Ct. 1970. In rejecting the objective test for deliberate indifference, the Supreme Court explained as follows:

> [A]n official's *failure to alleviate a significant risk that he should have perceived but did not,* while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.

*Id.* at 838, 114 S.Ct 1970 (emphasis added). Therefore, an official who is not aware of a substantial risk cannot be held liable under the Eighth Amendment. Nevertheless, the Supreme Court allowed that the fact finder might find the existence of subjective knowledge on the part of a prison

---

**8.** *Farmer* was not a Section 1983 action but, rather, a *Bivens*-type suit brought by an inmate in a federal prison against federal prison officials. Nevertheless, it is the last word on what the Eighth Amendment requires with respect to prison health and safety. Further, *Farmer* did not concern a prison suicide but, rather, the violent assault of a transsexual inmate by other inmates. It was alleged that the federal prison officials acted with deliberate indifference when they placed a transsexual inmate in the general prison population, thereby failing to protect him from attacks of other inmates.

**9.** The Estate contends, and the trial court agreed, that *Farmer* effectively eliminated the objective "should have known" language from the second prong of the *Colburn II* standard. Notably, the Third Circuit continues to evaluate the liability of prison officials in prison suicide cases in accordance with the *Colburn II* standard, including whether the official "knew or should have known" of an inmate's particular vulnerability to suicide. *See, e.g., Woloszyn v. County of Lawrence*, 396 F.3d 314 (3d Cir.2005). This Court is not bound by the Third Circuit's interpretation of the Eighth Amendment but only by our Supreme Court's interpretations and those of the United States Supreme Court. *See Thomas v. City of Philadelphia*, 804 A.2d 97, 111 n. 29 (Pa.Cmwlth.2002).

official if it could be shown that inmates had suffered numerous injuries in the prison. *Id.* at 842, 114 S.Ct. 1970. *See also Beers–Capitol v. Whetzel,* 256 F.3d 120, 133 (3d Cir.2001) ("[S]ubjective knowledge on the part of the official can be proved by circumstantial evidence to the effect that the excessive risk was so obvious that the official must have known of the risk.").

### Liability of Meisel

■ The Estate did not sue any custodial officer or medical personnel who dealt with Decedent at the Prison. The trial court found that Meisel had no direct involvement with Decedent and, thus, "Meisel did not act with reckless indifference with respect to [D]ecedent's suicidal ideations and attempts to kill himself." Trial Court Opinion at 8. The only question was whether Meisel had liability for his actions as a supervisor, particularly with respect to the adoption of the Policy. The trial court found that Meisel could not be held liable, and we agree.

The gravamen of the Estate's claim is that the Policy, for which Meisel bears at least some responsibility, was "deliberately indifferent" to the Decedent's known vulnerability to suicide and therefore unconstitutional.[10] The Estate argues that Meisel considered nationally accepted suicide prevention standards promulgated by the American Correctional Association (ACA) and the National Commission on Correctional Health Care (NCCHC),[11] but he did not incorporate them into the Policy. The result, the Estate claims, was a

Policy deliberately indifferent to the needs of those inmates, including Decedent, with a vulnerability to suicide. The Estate identifies two ways in which the Policy's deviations from the ACA and NCCHC's standards made the Policy constitutionally infirm.

First, the Estate objects to the Policy because it does not require, or even provide for, "constant observation" of suicidal inmates. By contrast, the NCCHC standards suggest that "[a]n inmate assessed as being a high suicide risk always should be observed on a continuing, uninterrupted basis or transferred to an appropriate health care facility." R.R. 73a. Although constant observation is, and has been, provided to Prison inmates when ordered by medical staff, the Estate rejoins that this is insufficient. The NCCHC standards require constant observation of a suicidal inmate, with or without a medical order. If Decedent had been under constant observation, even by a fellow inmate, the Estate believes he would not have been able to hang himself.

Second, the Estate complains that the Prison's "suicide precaution cells," required under the Policy, are not suicide-resistant because they have open bars and other ligature points, such as towel bars. The NCCHC recommends that a suicidal inmate's cell "should be as nearly suicide-proof as possible (i.e., without protrusions of any kind that would enable the inmate to hang him/herself)." R.R. 73a. The Estate argues that covering the cell bars with

---

**10.** The Estate essentially conceded at oral argument that its case hinges on the constitutionality of the Policy itself.

**11.** The Policy specifically references the ACA and NCCHC standards, and Sweeney acknowledged that the standards were considered in formulating the Policy. Sweeney Depo. 44. To support their deliberate indifference claim, Appellants relied on the ACA

and NCCHC standards as well as a report authored by their expert, Lindsay M. Hayes, who opined, based on the standards, that the Policy was constitutionally infirm. Hayes is a project director at the National Center on Institutions and Alternatives and a nationally recognized expert in the field of suicide prevention in correctional facilities.

a clear material is a more effective way to make a cell suicide-resistant.

The Estate's reliance on the ACA and NCCHC standards as the baseline against which to measure the constitutionality of the Policy is misplaced. Those standards represent the recommendations of private organizations in the corrections field that provide accreditation services to correctional facilities. They were not intended to be constitutional mandates, nor could they be since they have not been adopted by any governmental entity. The failure of a correctional facility to comply with these standards means only that it will not be accredited by ACA or NCCHC.

Moreover, the United States Supreme Court has held, in the context of a prison conditions case, that correctional standards issued by organizations like ACA and NCCHC, and even by the Department of Justice, may be instructive in certain cases but "do not establish the constitutional minima; rather, they establish goals recommended by the organization in question." *Bell v. Wolfish,* 441 U.S. 520, 543 n. 27, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Meisel explained, for example, why cells with clear, solid walls, as recommended by the ACA and NCCHC, were not preferable to the open-barred holding cells in the Prison used to house suicidal inmates. Even if Meisel were wrong in his judgment, this does not demonstrate deliberate indifference but, at most, negligence. Deliberate indifference "describes a state of mind more blameworthy than negligence." *Farmer,* 511 U.S. at 835, 114 S.Ct. 1970.

Other cases involving a challenge to the constitutionality of a prison's suicide prevention policy illustrate the Estate's very high burden in this case. For example, in *Litz v. City of Allentown,* 896 F.Supp. 1401 (E.D.Pa.1995), the plaintiff's ward, Bobby F. Chain, Jr., attempted to commit suicide while in a holding cell at the Allen-

town Police Department. Department policies required officers to remove prisoners' belts, excess clothing, shoelaces and personal effects. In addition, video cameras were installed in the cells and officers were required to observe prisoners every 30 minutes, or every 15 minutes if the prisoner was suicidal. Despite these measures, Chain attempted to hang himself with his socks and suffered brain damage. Plaintiff initiated a Section 1983 action against the City of Allentown, the Chief of Police and several other officers in their official capacities. Plaintiff argued, *inter alia,* that certain proposed department policies, which were rejected, would have prevented the incident. These included installing a videotaping system; removing prisoners' socks; removing prisoners' clothing and providing them with paper suits; and installing wire mesh on the bars of cell doors. Based on these omissions, plaintiff claimed that defendants engaged in an unconstitutional custom, practice or policy.

The District Court granted summary judgment in favor of the municipal defendants. In doing so, the court thoroughly reviewed the development of the Third Circuit's legal standard for Section 1983 liability in prisoner suicide cases, culminating with *Colburn I* and *Colburn II.* The District Court held that in order to state a cognizable claim under Section 1983, plaintiff had to show

> the policymakers were aware of (1) the risk of suicides in city lockups, and (2) feasible alternatives for preventing them, and that they either (a) deliberately chose not to pursue those alternatives, or (b) acquiesced in a long-standing policy or custom of inaction.

*Id.* at 1412 (citing *Simmons v. City of Philadelphia,* 947 F.2d 1042, 1067 (3d Cir.

1991) (opinion announcing judgment of the court)).[12]

Applying the foregoing standard, the District Court noted that only three successful suicides and several attempted suicides had occurred in the six years preceding Chain's attempt to hang himself. During that time the municipality had adopted policies requiring the removal of excess clothing and observation of detainees to prevent such incidents. The municipality's actions, in the court's view, did not communicate a message of tacit approval of, or acquiescence in, prisoner suicides. Rather, the policy reflected a reasonable response to the risk of suicide, and went beyond the steps taken in other cases where a similar constitutional challenge to a suicide prevention policy was rejected. *See, e.g., Williams v. Borough of West Chester*, 891 F.2d 458 (3d Cir. 1989) (plaintiff claimed that municipality had violated decedent's rights by failing to require removal of detainees' belts, install visual surveillance equipment, allocate funds for mental health treatment, and train officers in handling at-risk detainees). Accordingly, the *Litz* court held that the failure of the city to adopt the additional measures identified by plaintiff at most amounted to "mere negligence, which falls short of the threshold for stating a Section 1983 claim." *Litz*, 896 F.Supp. at 1413.

As in *Litz*, the Estate's challenge to the Policy is not based upon evidence tending to show "a level of culpability higher than a negligent failure to protect [Decedent] from self-inflicted harm." *Colburn II*, 946 F.2d at 1024. The Estate had to demonstrate that Meisel had subjective knowledge of a substantial risk of serious harm to suicidal inmates and consciously chose to disregard that risk. The Estate had to show what the Supreme Court has characterized as a "culpable state of mind" that is "more blameworthy than negligence." *Farmer*, 511 U.S. at 834, 835, 114 S.Ct. 1970. The Third Circuit has characterized this state of mind as "scienter-like evidence of indifference on the part of a particular policymaker or policymakers." *Simmons*, 947 F.2d at 1060–1061.[13] The Estate simply failed to demonstrate this requisite culpable state of mind on the part of Meisel.

Significant to the trial court's analysis, and our own, is the fact that there was only one inmate suicide at the Prison before Decedent's, and that incident occurred in 1995, seven years before Decedent took his own life. Moreover, the Estate's own evidence showed that there were only five suicide attempts between 2000 and 2002, including Decedent's first attempt. There was certainly no pattern of such incidents that showed that there was an obvious risk which the Policy did not address. Stated

---

12. The District Court found deliberate indifference in *Simmons v. City of Philadelphia*, 728 F.Supp. 352 (E.D.Pa.1990), and its decision was affirmed by the Third Circuit in the above-cited judgment of the court. In *Simmons*, the City of Philadelphia lock-up officers admitted to having no training in suicide prevention, despite the fact that 20 people committed suicide in a five-year period in City lock-ups under circumstances similar to the decedent's. *Id.* at 356. The City failed to implement numerous preventative measures which could have saved the decedent; the officers took no preventative action despite

knowing that the decedent was high-risk; and they made no effort to perform any type of resuscitation after he was found hanging in his cell. *Id.* at 353–354.

13. Although *Simmons* was a plurality decision, the Third Circuit cited the "scienter-like evidence" language with approval in *Parkway Garage, Inc. v. City of Philadelphia*, 5 F.3d 685, 692 (3d Cir.1993), *abrogated on other grounds, United Artists Theatre Circuit, Inc. v. Township of Warrington*, 316 F.3d 392 (3d Cir.2003).

otherwise, there was no circumstantial evidence presented by the Estate that would have allowed the trial court to find that there was a substantial risk of suicide created by the Policy that was known to Meisel.[14] *Farmer*, 511 U.S. at 842, 114 S.Ct. 1970; *Beers–Capitol*, 256 F.3d at 133. To the contrary, given the large number of persons that passed through the Prison during Meisel's tenure, in excess of 50,000, and the infrequent suicides, three between 1989 and 2003, the Policy appeared to be effective in preventing suicides by inmates.

The final piece of the Estate's claim against Meisel is the assertion that the Policy, ineffective as it was, was not properly implemented. The Estate contends that the suicide precaution cell in which Decedent was last housed, Cell 3223, in addition to not being suicide-resistant, was not clearly observable from the guard control booth, as required by the Policy. The Estate asserts that the sightline between the control booth and Cell 3223 was partially obstructed by an open staircase. A completely unobstructed sightline between the booth and Cell 3223 would have allowed for better observation of Decedent and prevented him from hanging himself.

However, the Estate failed to produce any evidence that Meisel knew that Cell 3223 was unsafe and continued to use it as a suicide prevention cell. In the absence of this knowledge, Meisel cannot be found deliberately indifferent, even if we accept the Estate's premise that Cell 3223 was an inappropriate cell in which to place Decedent.

This is also the flaw in the Estate's claim that Decedent should have been placed under constant observation. The Estate presented no evidence that had the medical staff directed more observation of Decedent, it would not have been provided. As noted by the trial court, suicide is a mental health issue, and the custodial officers relied upon the advice of mental health professionals in dealing with Decedent. This is not deliberate indifference by anyone at the Prison, least of all by Meisel.

This is undeniably a tragic case. A single suicide in any correctional facility is one too many. Nevertheless, as the Third Circuit admonished, "we cannot place ... custodial officers and employees 'in the position of guaranteeing that inmates will not commit suicide.'" *Colburn II*, 946 F.2d at 1030–1031 (quoting *Colburn I*, 838 F.2d at 669). At every stage of Decedent's incarceration, the officers supervised by Meisel made a concerted effort to keep Decedent safe and to prevent him from harming himself. Decedent was evaluated by medical staff and placed on increased levels of observation as warranted, including physical restraint. He was frequently observed by Prison officials in accordance with the Policy.[15] The Estate simply pre-

---

**14.** Actual knowledge could be demonstrated by evidence showing that a substantial risk of inmate suicides was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk ... then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk." *Farmer*, 511 U.S. at 842–843, 114 S.Ct. 1970.

**15.** Based upon these uncontradicted facts, the trial court observed as follows:

[D]ecedent's placement on suicide watch by the medical staff and the [D]ecedent's ultimate placement in Cell 3223 were reasonable under the circumstances.... The record reflects that Defendant Dale Meisel, as a supervisor, acted reasonably with respect to the [D]ecedent and his risk of suicide, and [D]ecedent's injury does not bear a close causal relationship to Defendant Dale Meisel's alleged failure to respond adequately.

sented no evidence that Meisel consciously made decisions with respect to Decedent individually, or suicidal inmates generally, to place him and other suicidal inmates at risk.

## Lehigh County Liability

■ Section 1983 provides a vehicle by which a citizen may seek redress from a person who, acting under color of state law, deprives an individual of rights, privileges or immunities secured by the United States Constitution. 42 U.S.C. § 1983. A municipality is a "person" that can be sued directly under Section 1983 and held liable, in some circumstances. *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Of course, municipal officials acting in their official capacity are also considered "persons" under Section 1983. *Id.* at 690, n. 55, 98 S.Ct. 2018. A municipality cannot, however, be held liable under Section 1983 on a *respondeat superior* theory. *Id.* at 691, 98 S.Ct. 2018. Rather, liability will be imposed when the municipality implements an official policy that is either unconstitutional on its face or is the "moving force" behind the constitutional tort of one of its employees. *Id.* at 694, 98 S.Ct. 2018; *Polk County v. Dodson*, 454 U.S. 312, 326, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981).[16]

The trial court held that because the Estate failed to show a constitutional violation by a municipal actor, Meisel, its claim against Lehigh County failed as a matter of law. We agree.

The United States Supreme Court has held that *Monell* does not authorize

> the award of damages against a municipal corporation based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm. If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point.

---

Trial Court Opinion at 15–16. The Estate contends that it was for the jury, not the trial court, to make these findings of reasonableness. The Estate's argument here is flawed.

First, the holding of the trial court did not turn on the question of whether Meisel responded reasonably to Decedent's medical needs but whether Meisel had *subjective* knowledge of Decedent's particular situation. Because Meisel did not have actual knowledge about Decedent, the inquiry does not need to go to the next step directed by *Farmer, i.e.*, whether the prison official acted reasonably. *Farmer*, 511 U.S. at 844, 114 S.Ct. 1970. Accordingly, the trial court's above-cited observations are not central to the holding and, thus, are *dicta*.

Second, we disagree that the conclusion of whether a prison official with actual knowledge acted reasonably, assuming it were dispositive in this case, is a factual question. It is for the courts to determine, under *Farmer*, whether particular conduct is so unreasonable as to constitute the infliction of cruel and unusual punishment.

We agree with Meisel and Lehigh County that the Estate's argument twists the deliberate indifference inquiry into a question of whether a prison policy or practice was reasonable. That is not what *Farmer* teaches.

16. A concededly valid official policy may be deemed the "moving force" behind a constitutional tort when it is "unconstitutionally applied by a municipal employee." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 387, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) (wherein police officers did not summon medical assistance for plaintiff, who fell down several times and became incoherent while being processed at the police station for a speeding violation). Municipal liability under Section 1983 will lie if the municipality's failure to adequately train its employees results in the constitutional deprivation, *and* the "failure to train" reflects deliberate indifference to the constitutional rights of its inhabitants. *Id.* at 392. The Estate does not assert a "failure to train" theory of liability, opting instead to challenge the Policy itself as unconstitutional.

*City of Los Angeles v. Heller,* 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986) (emphasis original). In *Trigalet v. City of Tulsa, Oklahoma,* 239 F.3d 1150 (10th Cir. 2001), the Court of Appeals held, consistent with nearly every other Court of Appeals, that a municipality cannot be held liable in a Section 1983 action in the absence of a predicate unconstitutional act by the municipality's employee. Even if the municipality's actions are arbitrary or even "conscience shocking, in a constitutional sense" the municipality cannot be held liable under Section 1983. *Id.* at 1151. This is because a claim of "inadequate training [or] supervision ... under § 1983 cannot be made out against a supervisory authority absent a finding of a constitutional violation by the person supervised." *Id.* at 1154 (quoting *Webber v. Mefford,* 43 F.3d 1340, 1344–45 (10th Cir.1994)).

This Court has expressly adopted the *Trigalet* analysis. *Thomas v. City of Philadelphia,* 804 A.2d 97, 112 (Pa.Cmwlth. 2002) ("We hold, therefore, that in the absence of an underlying unconstitutional action by employees of the City ..., we will not consider the question of whether the City [has liability] ...".); *Robbins v. Cumberland County Children and Youth Services,* 802 A.2d 1239, 1250–1251 (Pa. Cmwlth.2002) (accepting the "reasoning of the vast majority of federal circuits, which adopt the general rule that a municipality cannot be liable unless there is a constitutional violation by the municipal actor causing the plaintiff's harm"). The Estate counters that this Court should follow *Fagan v. City of Vineland,* 22 F.3d 1283 (3d Cir.1994). As this Court has explained, *Fagan* has not even been followed by the Third Circuit in subsequent cases, and the

*Fagan* analysis was expressly rejected by this Court in both *Thomas and Robbins. Thomas,* 804 A.2d at 111.[17]

Because the Estate failed to make the threshold showing that a municipal employee, Meisel, violated the Decedent's constitutional rights, the Estate's claim against Lehigh County fails.

### Nanty–Glo

■ The Estate raises an additional challenge on appeal: that the trial court impermissibly relied upon oral deposition testimony in violation of the rule announced by our Supreme Court in *Borough of Nanty–Glo v. American Surety Co. of New York,* 309 Pa. 236, 163 A. 523 (1932). The so-called *Nanty–Glo* rule provides that a court may not summarily enter a judgment based upon oral testimony since the credibility of such testimony is within the province of the jury. The Estate argues that the trial court erred by relying upon Meisel's deposition testimony that Prison officials will provide for constant observation of a suicidal inmate when directed to do so by medical staff. The Estate also makes a vague assertion that the trial court erroneously considered Meisel's and Sweeney's testimony that "various alternatives were or were not reasonable or feasible to support Summary Judgment." Appellants' Brief at 24.

The *Nanty–Glo* rule is not applicable to every summary judgment proceeding. *Kirby v. Kirby,* 455 Pa.Super. 96, 687 A.2d 385, 388 (1997). Rather, our appellate courts follow a three-step analysis to determine whether the *Nanty–Glo* rule will preclude a grant of summary judgment:

Initially, it must be determined whether the plaintiff has alleged facts sufficient

---

**17.** The Estate argues that the Third Circuit has returned to the *Fagan* approach, citing to *Brown v. Commonwealth of Pennsylvania, Department of Health Emergency Medical Services Training Institute,* 318 F.3d 473 (3d Cir. 2003). The Estate fails to understand, appar-

ently, that this Court decided in *Thomas* and in *Robbins* to join the view of the majority of federal appellate courts in holding that a "municipality cannot be liable unless there is a constitutional violation by [a] municipal actor." *Robbins,* 802 A.2d at 1251.

to establish a prima facie case. If so, the second step is to determine whether there is any discrepancy as to any facts material to the case. Finally, it must be determined whether, in granting summary judgment, the trial court has usurped improperly the role of the jury by resolving any material issues of fact. *Id.* at 388, *cited with approval in Azar v. Ferrari,* 898 A.2d 55, 61 n. 9 (Pa.Cmwlth. 2006).

Applying the foregoing test, we find that the *Nanty–Glo* rule is not applicable in this case. While it may be true that the trial court referred to deposition testimony from Meisel, Sweeney and other Prison officials regarding the Prison's policies and practices, that testimony was not dispositive or, in the end, even material to the judgment. As explained at length above, the Estate failed to adduce facts sufficient to establish that Meisel and Lehigh County acted with *deliberate indifference* toward Decedent's known vulnerability to suicide. Therefore, under the first prong of *Kirby,* the Estate failed to establish a *prima facie* case under 42 U.S.C. § 1983.

### Conclusion

For the foregoing reasons, we affirm the order of the trial court granting summary judgment in favor of the County of Lehigh and Dale Meisel.[18]

### ORDER

AND NOW, this 3rd day of May, 2007, the order of the Court of Common Pleas of Lehigh County in the above-captioned matter, entered April 26, 2006, is hereby AFFIRMED.

---

18. In its brief and reply brief to this Court, the Estate argues that the trial court erred by failing to consider whether Meisel and Lehigh County could be held liable under a "state-created danger" theory. We note that this theory of liability is not set forth in the complaint. Assuming, *arguendo,* that the Estate raised and preserved a state-created danger claim, it would not be entitled to relief under that doctrine. In *Robbins v. Cumberland County Children and Youth Services,* 802 A.2d 1239 (Pa.Cmwlth.2002), this Court adopted the standard followed by the Third Circuit for liability under the state-created danger theory in Section 1983 actions. That standard requires that:

> (1) the harm ultimately caused was foreseeable and fairly direct; (2) *the State actor acted in willful disregard for the safety of the* *plaintiff;* (3) there existed some relationship between the State and the plaintiff; [and] (4) the State actors used their authority to create an opportunity that otherwise would not have existed for the third party's crime to occur.

*Id.* at 1247 n. 8 (citing *Kneipp v. Tedder,* 95 F.3d 1199, 1208 (3d Cir.1996)) (emphasis added). In *Kneipp* the Third Circuit equated "willful disregard" with "deliberate indifference." *Id.* at 1208 n. 21. In the present case, regardless of the theory advanced, the Estate failed to adduce evidence sufficient to demonstrate that the Policy or the actions of Meisel and Lehigh County were deliberately indifferent to Decedent's vulnerability to suicide. Therefore, the Estate's state-created danger theory of liability would have failed as a matter of law.